693 So.2d 953 (1997)
Thomas Lee GUDINAS, Appellant,
v.
STATE of Florida, Appellee.
No. 86070.
Supreme Court of Florida.
April 10, 1997.
Rehearing Denied May 20, 1997.
*956 James B. Gibson, Public Defender and Christopher S. Quarles, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon appellant Thomas Lee Gudinas. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm Gudinas' convictions for first-degree murder, two counts of sexual battery, attempted sexual battery, and attempted burglary with an assault. We also affirm his sentence of death.

FACTS
Gudinas and three of his roommates arrived at an Orlando bar, Barbarella's, between approximately 8:30 and 9 p.m. on May 23, 1994. Prior to arriving at the bar, the group drank beer and smoked marijuana at their apartment and in the car on the way to the bar. While drinking throughout the night, Gudinas and his roommates periodically returned to their car to smoke marijuana. However, when the bar closed at 3 a.m, Gudinas could not be located. One of Gudinas' roommates, Todd Gates, testified that he last saw Gudinas in the bar at approximately 1 a.m.
Rachelle Smith and her fiance arrived at the same bar between 11 and 11:30 p.m. They stayed until about 2 a.m. Rachelle left the bar at that time, while her fiance remained inside saying goodbye to friends. She initially went to the wrong parking lot where she saw a man watching her while crouched behind another car. Realizing she was in the wrong parking lot, Rachelle walked to the lot where her car was parked. Because she felt she was being followed, she immediately got into her car and locked the door. Looking into her mirror, she saw the same man she had just seen crouched behind a car in the other parking lot. After trying to open Rachelle's passenger side door, the man crouched down, came around to the driver's side and tried to open the door. While screaming at Rachelle, "I want to f you," the man covered his hand with his shirt and began smashing the driver's side window. Rachelle blew the horn and the man left. Upon hearing of the murder that occurred nearby that same night, Rachelle contacted police, gave a description of the man, and identified Gudinas from a photographic lineup as the man who tried to attack her.[1] She also identified Gudinas at trial.
The victim, Michelle McGrath, was last seen at Barbarella's at approximately 2:45 a.m. She apparently had left her car in the same parking lot where Rachelle Smith first saw Gudinas crouching behind a car. Between 4 and 5 a.m., Culbert Pressley found Michelle's keys and a bundle of clothes next to her car in the parking lot.[2] Her body was *957 discovered at about 7:30 a.m. in an alley next to Pace School.[3] Michelle was naked, except for a bra which was pushed up above her breasts.
Jane Brand flagged down Officer Chisari of the Orlando police bicycle patrol. Officer Chisari had been informed by a deputy sheriff on the scene that Pressley had found some keys. Pressley then told Chisari he had just given them to "that guy," referring to a man walking south. As Chisari then rode toward the man, Ms. Brand screamed as she spotted Michelle's body. Chisari returned to where Ms. Brand was. Subsequently, he saw a man he later identified as Gudinas driving a red Geo Metro from the parking lot where Michelle had parked her car. Pressley wrote down the car's license plate and the tag number was traced to Michelle McGrath. The car was later recovered at 7 p.m. that night at the Holiday Club Apartments.[4]
During the jury trial, all four[5] of Gudinas' roommates testified that he was not at their apartment when they returned from Barbarella's. Frank Wrigley said he next saw Gudinas that afternoon; he had blood on his underwear and scratches on his knuckles, allegedly from a fight with two black men who tried to rob him. Todd Gates testified that Gudinas was at the apartment when he awoke between 8:30 and 9 a.m., wearing boxer shorts covered with blood, allegedly from a fight with a black man. Fred Harris offered similar testimony. Fred added that later that day, after being asked if Michelle was "a good f___," Gudinas replied, "Yes, and I f___ed her while she was dead." Dwayne Harris likewise testified that he heard Gudinas say, "I killed her then I f___ed her."
Dr. Hegert, the medical examiner, testified that the cause of death was a brain hemorrhage resulting from blunt force injuries to the head, probably inflicted by a stompingtype blow from a boot. He found severe cerebral edema and determined that Michelle died thirty to sixty minutes after the fatal injury, the forceful blow to the head. Dr. Hegert also found defensive wounds on one of Michelle's hands and two broken sections of a stick, one inserted two inches into her vagina and the other inserted three inches into the area near her rectum. In addition, Dr. Hegert also determined that Michelle had been vaginally and anally penetrated by something other than the sticks, as indicated by trauma to her cervix. He also found that Michelle had a blood alcohol content of. 17% at the time of her death. While Michelle might have lived longer without that amount of alcohol in her system, Dr. Hegert testified that the head injury would have been fatal anyway. He estimated the time of death to be between 3 and 5 a.m.
Timothy Petrie, a serologist with the Florida Department of Law Enforcement, testified that he found semen on the vaginal swab as well as on a swab of Michelle's thigh. Amanda Taylor, a latent fingerprint examiner with the Orlando Police Department, identified a latent fingerprint on the alley gate pushbar as Gudinas' right palm and thumbprints on Michelle's car loan payment book as Gudinas'. Taylor acknowledged she had no way of knowing when the prints were made.
After the trial concluded, the jury returned a guilty verdict on all counts. The penalty phase commenced several days later.
*958 During the penalty phase, the State introduced certified copies of Gudinas' Massachusetts felony convictions. These included convictions for burglary of an automobile; assault; theft; assault with intent to rape; indecent assault and battery; and assault and battery. These offenses all occurred in the early 1990's.
Karen Ann Goldthwaite, Gudinas' mother, testified that she had a difficult pregnancy and delivery with Gudinas and that he had some health problems during the first six months of life. She also testified that he had extreme temper tantrums as a small boy, although he was never violent toward others. His teacher reported that he was hyperactive at school, sometimes throwing chairs and acting up. Mrs. Goldthwaite had Gudinas evaluated at Boston University when he was six. Thereafter, she sought help from the Massachusetts Division of Youth Services. Over the next several years, Gudinas had 105 different placements through that agency. Mrs. Goldthwaite was advised that Gudinas should be placed in a long-term residential program, but she was never able to accomplish this.[6] Because of his treatment in numerous facilities, Gudinas only completed his formal education through the fourth grade, although he eventually attained his GED. He also was diagnosed as having a low IQ. Finally, Gudinas' mother testified that he began drinking alcohol while a juvenile, smoked marijuana, and had used cocaine and LSD.
Michelle Gudinas, Gudinas' younger sister, testified that their father put Gudinas' hand over an open flame as punishment for playing with matches. She also testified that on another occasion, as punishment for wetting his bed, their father made Gudinas stand in front of their house in his underwear wearing a sign that said "I will not wet the bed." Ms. Gudinas noted that Gudinas had a good relationship with his stepfather. She denied ever having any sexual contact with her brother or telling anyone she had. However, in rebuttal, Emmitt Browning, an Orlando Police Department investigator, testified that Ms. Gudinas told him she was at a party and went into a bedroom with her brother. She allegedly said her brother lay on top of her and began tearing her swim suit off before some of their cousins entered the room and pulled Gudinas off her.
Dr. James Upson, a clinical neuropsychologist, testified for Gudinas. He concluded that Gudinas was seriously emotionally disturbed at the time of the murder and that the "symbolism" of the crime indicated that he was "quite pathological in his psychological dysfunction." Dr. Upson testified that Gudinas has an IQ of 85, in the low-average range. Testing revealed that Gudinas has very strong underlying emotional deficiencies. Dr. Upson explained that this type of person has a higher degree of impulsivity, sexual confusion and conflict, bizarre ideations, and manipulative behavior, tends to be physically abusive, and has the capacity to be violent. He noted that these behaviors escalate when the person is either threatened or loses control. Dr. Upson felt that Gudinas would probably be a danger to others in the future unless he was properly treated and that the murder was consistent with the behavior of a person with his psychological makeup.
Dr. James O'Brian, a physician and pharmacologist, was recognized by the trial court as an expert witness in the area of toxicology. He testified that Gudinas is unable to control his impulses in an unstructured environment and opined that Michelle's murder was impulsive. Gudinas told Dr. O'Brian that on the day before the murder, he ate marijuana "joints" at breakfast, at 1:30 p.m., five between 3 and 8 p.m., and another at 1 a.m. the following morning. Gudinas also reported that he drank alcohol between 1:30 and 3 p.m. and 9:30 p.m. and 2 a.m. the following morning. Dr. O'Brian testified that marijuana and alcohol remove inhibitions, thus allowing the underlying personality to show through. He stated that as the dosage increased, someone like Gudinas would not be able to control his "strong impulses." Based on his alcohol consumption and evaluation *959 of Gudinas' underlying psychological makeup, Dr. O'Brian concluded that Gudinas' ability to conform his behavior to the requirements of the law was substantially impaired on the night of the murder.
The jury recommended a death sentence by a vote of ten to two. The trial court conducted a sentencing hearing on May 19, 1995, and imposed Gudinas' sentence in a separate proceeding on June 16, 1995. After adjudicating Gudinas guilty on all counts, the court sentenced him to death for the firstdegree murder of Michelle McGrath.[7] The court also sentenced Gudinas to thirty years for attempted burglary with an assault, thirty years for attempted sexual battery, and life imprisonment for each count of sexual battery.

APPEAL
Gudinas raises twelve claims of error on appeal.[8] Claim (4) is without merit and simply restates arguments made in claim (2). Claim (10) is procedurally barred because no contemporaneous objection was made to the prosecutor's argument and the jury instruction issue was not raised at trial. We address the remaining issues in turn.

Joinder
Gudinas first contends that the trial court improperly allowed the joinder of his alleged offenses against Rachelle Smith with those against Michelle McGrath in one trial. The State responds that the offenses were properly joined as being part of a spree of crimes committed by Gudinas. The State also contends that the crimes against Rachelle Smith constitute admissible similar fact evidence in Gudinas' murder prosecution.
In Ellis v. State, 622 So.2d 991 (Fla.1993), we surveyed our cases interpreting joinder based on "two or more connected acts or transactions" within the meaning of rule 3.150(a), Florida Rules of Criminal Procedure. We first reviewed Wright v. State, 586 So.2d 1024 (Fla.1991), where we stated:
"[T]he rules do not warrant joinder or consolidation of criminal charges based on similar but separate episodes, separated in time, which are `connected' only by similar circumstances and the accused's alleged guilt in both or all instances." Courts may consider "the temporal and geographical association, the nature of the crimes, and the manner in which they were committed." However, interests in practicality, efficiency, expense, convenience, and judicial economy, do not outweigh the defendant's *960 right to a fair determination of guilt or innocence.
Id. at 1029-30 (citations omitted) (quoting Garcia v. State, 568 So.2d 896, 899 (Fla. 1990)). We further addressed the rules of permissible joinder in Crossley v. State, 596 So.2d 447, 450 (Fla.1992), wherein we explained that "[t]he danger in improper consolidation lies in the fact that evidence relating to each of the crimes may have the effect of bolstering the proof of the other." To forestall that possibility, we required trial courts to find "a meaningful relationship between the charges of two separate crimes before permitting them to be tried together." Id. (emphasis added).
We next analyzed our decision in Bundy v. State, 455 So.2d 330 (Fla.1984), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986), where the defendant first attacked four women, killing two, in a Florida State University sorority house. Roughly an hour later, Bundy attacked a fifth woman in an apartment house several blocks away. Id. at 334-35. In Bundy, we found that "the criminal acts [were] connected by the close proximity in time and location, by their nature, and by the manner in which they were perpetrated." Id. at 345. We later characterized the Bundy crimes as "a classic example of an uninterrupted crime spree in which no significant period of respite separated the multiple crimes." Ellis, 622 So.2d at 999.
In Fotopoulos v. State, 608 So.2d 784 (Fla. 1992), cert. denied, 508 U.S. 924, 113 S.Ct. 2377, 124 L.Ed.2d 282 (1993), the defendant induced a woman to murder another man while he videotaped the shooting. He then used the video to blackmail the woman into hiring a hit man to murder his wife a month later. We found that since one crime induced the other crime, a sufficient causal link existed to permit joinder. Id. at 790. From our review of those cases, we concluded:
First, for joinder to be appropriate the crimes in question must be linked in some significant way. This can include the fact that they occurred during a "spree" interrupted by no significant period of respite, Bundy, or the fact that one crime is causally related to the other, even though there may have been a significant lapse of time. Fotopoulos. But the mere fact of a general temporal and geographic proximity is not sufficient in itself to justify joinder except to the extent that it helps prove a proper and significant link between the crimes. Crossley.

Ellis, 622 So.2d at 1000. With those rules in mind, "we must consider where on the spectrum [this case] falls." Id.
Gudinas made three separate, unsuccessful attempts to break into Rachelle Smith's car after following her from the other parking lot. His intention to sexually assault her was made clear by the vulgar language he shouted at her as he attempted to smash his way through the driver's side window. His actions indicate he was willing to forcibly enter Rachelle Smith's car. He did not have to yell, "I want to rape you," in order for his criminal intentions to be apparent.
Unsuccessful in his attempt to rape Smith, the record[9] reflects that within no more than three hours and in the same proximate area, Gudinas brutally raped and murdered Michelle McGrath. Gudinas' failure to complete his attack against Rachelle Smith may have provided a causal link to his completed attack on Michelle McGrath, thus allowing joinder under Fotopoulos. Furthermore, the State makes a persuasive argument that the attacks were separated by less than one hour. Under the State's scenario or even if approximately three hours elapsed, Gudinas' offenses constitute a crime spree as contemplated in Bundy. The attempted rape and accompanying violence of his aborted entry into Rachelle Smith's car, and the actual rape and extreme violence of his murder of Michelle McGrath demonstrate a "meaningful relationship" between the two attacks as required by Crossley.
Furthermore, we agree with the State that even if the charges should have been severed, any error would be harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla.1986). Rachelle Smith's testimony still would have been admissible in a *961 severed trial for the McGrath attack as similar fact evidence in establishing Gudinas' motive for raping and murdering Michelle McGrath. Charles W. Ehrhardt, Florida Evidence § 404.14 (1995 ed.). Evidence of Gudinas' unsuccessful attack against Rachelle Smith was relevant to show his motive for another attack later that morning. Thus, even if the charges were severed, Rachelle Smith's testimony regarding her encounter would have been admissible as similar fact evidence in Gudinas' murder trial. For the same reasons, we do not find that inclusion of the Rachelle Smith charges with the charges relating to Michelle McGrath's murder deprived Gudinas of a fair trial.[10]
Therefore, considering the facts of this case and our prior case law, we find that the trial court did not abuse its discretion in consolidating all five counts in the information into one trial.

Pre-trial Hearing
Gudinas next claims that he had an absolute right to be present at the in-chambers discussion regarding his defense counsel's motion to withdraw. The State responds that the issue was not preserved for appellate review and, even if it was, any error was harmless beyond a reasonable doubt.
Gudinas did not raise a contemporaneous objection to his exclusion from the in-chambers discussion between the attorneys and the trial judge. Therefore, we agree with the State that this issue is procedurally barred. Davis v. State, 461 So.2d 67, 71 (Fla.1984) (stating that "[i]n the absence of fundamental error the failure to object precludes consideration of this point on appeal"), cert. denied, 473 U.S. 913, 105 S.Ct. 3540, 87 L.Ed.2d 663 (1985). However, Gudinas appears to be claiming fundamental error, citing Francis v. State, 413 So.2d 1175, 1177 (Fla.1982), for the proposition a defendant has the "constitutional right to be present at the stages of his trial where fundamental fairness might be thwarted by his absence." Fundamental error is "error which reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Archer v. State, 673 So.2d 17, 20 (Fla.1996) (quoting State v. Delva, 575 So.2d 643, 644-45 (Fla. 1991)), cert. denied, ___U.S. ___, 117 S.Ct. 197, 136 L.Ed.2d 134 (1996).
Our review of the record reveals that the trial judge went to great lengths, first, to determine what Gudinas' specific complaint about defense counsel was and, second, to inform him that he could always bring any concerns to Mr. LeBlanc, co-counsel, or write directly to the court itself. The judge informed Gudinas that unless defense counsel was acting incompetently, the court did not have to remove him as appointed counsel. The judge made no rulings during the in-chambers discussion where he and the attorneys discussed the "practicalities of proceeding." He had allowed Gudinas to fully air his concerns before the in-chambers discussion, and he did so again after the discussion. He did not rule on the motion until later that day after the hearing was concluded. Although Gudinas never specifically claimed that defense counsel was acting in a legally incompetent manner, the trial judge still conducted the inquiry properly and in accord with the procedure this Court approved[11] in Hardwick v. State, 521 So.2d *962 1071, 1074-75 (Fla.) (approving Nelson v. State, 274 So.2d 256, 258-59 (Fla. 4th DCA 1973)), cert. denied, 488 U.S. 871, 109 S.Ct. 185, 102 L.Ed.2d 154 (1988).[12] Therefore, we do not find fundamental error.
Finally, neither the record nor the trial's eventual outcome supports the conclusion that Gudinas was deprived of his constitutional right to a fair trial. After the trial court denied defense counsel's motion to withdraw, the issue never came up again. Therefore, in summary, we agree with the State that, first, the issue is procedurally barred, and, second, even if it was preserved and there was error, it would be harmless because Gudinas' absence did not frustrate the fairness of the proceeding and his presence would not have assisted the defense in any way. See Garcia v. State, 492 So.2d 360 (Fla.1986).

Motion for Judgment of Acquittal
Gudinas claims that the trial court erred in not granting his motion for judgment of acquittal for the attempted sexual battery of Rachelle Smith. The State counters that the uncontroverted evidence unambiguously reveals Gudinas' intent to sexually batter Rachelle Smith.
A motion for judgment of acquittal should not be granted unless "there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law." Taylor v. State, 583 So.2d 323, 328 (Fla.1991). In Rogers v. State, 660 So.2d 237 (Fla.1995), the defendant pulled a gun while riding in a car with a man and a woman. The defendant ordered the woman to take off her clothes but she refused. Id. at 240. He then asked the man to make the woman take off her clothes but he said he could not do that. After the defendant squeezed her left breast, the woman asked him to stop, which he did. The defendant made no further attempts to touch the woman. Id. at 241.
Considering these facts, we reversed Rogers' attempted sexual battery conviction, reasoning that while he "may have touched [the woman's] breast and ordered her to remove her clothes, these acts do not rise to the level of an overt act toward the commission of a sexual battery. In addition, once [the woman] refused Rogers' advances and orders, Rogers left her alone." Id. at 241. We then noted that to establish attempt, "the State must prove a specific intent to commit a particular crime and an overt act toward the commission of that crime." Id. We found that the State failed to meet its burden. Id.
Unlike Rogers, the State met its burden in this case by presenting undisputed eyewitness testimony that the defendant followed Rachelle Smith and then tried to forcibly enter her car on three separate occasions, including an attempt to smash her window while screaming, "I want to f___ you." Gudinas only ceased his attempt to gain entry to the car when Rachelle Smith "laid on the horn," creating a loud noise. In contrast, Rogers ceased his advances after simply being asked to stop, although he held the two people at gunpoint with both powerless to stop him.
The crux of Gudinas' argument is that he was "stating his desire, albeit in a socially unacceptable manner, to engage in perfectly legal, consensual sexual intercourse." His argument strains credulity considering he followed Rachelle Smith from the adjacent parking lot, attempted to open the passenger side door and then the driver's side door while she was inside the car, and then attempted to smash the driver's side window while yelling, "I want to fyou." That line of argument infers that Gudinas would have ceased and desisted if Rachelle Smith refused his advances after he presumably gained access to her car. He contends that *963 the "evidence does not reveal an overt act to support the charge of attempted sexual battery." While Gudinas correctly states that the evidence of his intent is circumstantial, he argues that the evidence fails to exclude the reasonable hypothesis that he was merely soliciting Rachelle Smith for a consensual sex act. However, any support for that hypothesis was dispelled by Rachelle Smith's unequivocal rejection of Gudinas' advances toward her. Gudinas' argument is wholly without merit.
Therefore, for the reasons stated, we find no error in the trial court's denial of Gudinas' motion for judgment of acquittal for the attempted sexual battery of Rachelle Smith.

Admissibility of Slides
Prior to trial, Gudinas objected to the State's proposed introduction of six slides of the victim's body in the alley as gruesome and cumulative. He also objected to two slides which showed the stick protruding from the victim's vagina and several slides of the body in the morgue. The trial court overruled all of Gudinas' objections.
The trial court also overruled Gudinas' renewed objections when the State sought to introduce the slides during the medical examiner's testimony. Gudinas claims that even if the slides were relevant, they were not necessary. He also claims that the only purpose for the slides' re-introduction during the penalty phase was to arouse overwhelming sympathy for the victim. Accordingly, he contends that their probative value was substantially outweighed by their prejudicial impact. § 90.403, Fla.Stat. (1993). We disagree.
We have stated that we will not disturb the trial court's ruling on the admission of photographic evidence absent a clear showing of abuse of discretion. Pangburn v. State, 661 So.2d 1182 (Fla.1995); Wilson v. State, 436 So.2d 908 (Fla.1983). We also have explained that the "test for admissibility of photographic evidence is relevancy rather than necessity." Pope v. State, 679 So.2d 710, 713 (Fla.1996), cert. denied, ___ U.S. ___, 117 S.Ct. 975, 136 L.Ed.2d 858 (1997).
During the guilt phase, the slides were relevant to the medical examiner's testimony as he explained the injuries depicted in the pictures. Because the slides were preliminarily screened by the trial court, and because they were relevant and necessary to the expert's testimony, we find no abuse of discretion in their admission into evidence. Pope. Considering the multiple injuries she sustained from Gudinas, we conclude that the slides of Michelle McGrath's body were necessary in order for the location and extent of those wounds to be accurately explained to the jury.
Furthermore, we agree with the State that during the penalty phase, the slides, already in evidence, were relevant to proving the heinous, atrocious, or cruel aggravating circumstance. We have reviewed the slides and find that they support the State's theory that Michelle McGrath was not dragged to the alley after being raped in the parking lot, presumably contemplated her fate during that short walk,[13] struggled in the alley with Gudinas, and sustained numerous injuries to her face, neck, hand, mouth, genital area, rectal area and head before losing consciousness and eventually dying. Therefore, we find no abuse of discretion in the trial court's admission of this photographic evidence during the guilt and penalty phases. Pangburn; Wilson.

Fred Harris's Testimony
Gudinas claims that the State improperly introduced a prior consistent statement during its direct and redirect examination of Fred Harris, which evidence was inadmissible hearsay. After the State refreshed his memory,[14] Fred Harris testified that he witnessed a conversation between his brother Dwayne and Gudinas. He stated that after Gudinas was jokingly accused of murdering Michelle McGrath, Gudinas replied, "Yes, and I f___ed her while she *964 was dead." After Harris denied that Gudinas sounded serious, the State again refreshed Harris's memory, after which he admitted telling the police in June 1994 that Gudinas "actually sounded serious." However, on cross-examination, Harris again denied that Gudinas sounded serious when he made the statement. He did so again on redirect examination at which time the State introduced the taped statement into evidence.
We agree that the statement was properly used for impeachment purposes only and was not inadmissible hearsay. Contrary to Gudinas' argument that the prosecutor improperly bolstered Harris's testimony with the introduction of the taped statement, the taped statement was plainly inconsistent with Harris's testimony at trial and constituted a prior inconsistent statement properly introduced for impeachment purposes only. State v. Smith, 573 So.2d 306 (Fla.1990); § 90.608, Fla.Stat. (1993). We also agree with the State that the foundational requirements of section 90.614(2), Florida Statutes (1993), were fully satisfied where Harris had the "opportunity to explain or deny the prior statement." As Professor Ehrhardt has explained, "[t]he prior statement is admissible to impeach only if it is in fact inconsistent; i.e., it directly contradicts the in-court testimony or there is a material variance between the two statements." Charles W. Ehrhardt, Florida Evidence, § 614.1, at 482 (1995 ed.). Considering the material inconsistencies in Harris's description of Gudinas' demeanor, we find that the State properly impeached its own witness. See § 90.608(1), Fla.Stat. (1993). Therefore, the trial court did not err in allowing the State to introduce Harris's prior inconsistent statement for impeachment purposes.

Collateral Evidence
Gudinas claims that his constitutional right to a fair trial was violated because the trial court denied his motion for a mistrial after Frank Wrigley's testimony indicated Gudinas' own cousin, Fred Harris, believed he was guilty. He argues that the denial of the motion constitutes reversible error which the trial court's curative instruction did not correct.
Gudinas also claims that Fred Harris testified about a completely unrelated charge against Gudinas in North Carolina. He claims that the trial court erred in denying his second motion for mistrial. We disagree in each instance.
To begin, Gudinas' claim of error regarding Frank Wrigley's testimony is procedurally barred because no specific, contemporaneous objection was made. Second, we agree with the State that the trial judge did not abuse his discretion in denying Gudinas' motion for mistrial regarding Fred Harris's comment about pending charges against Gudinas in North Carolina. This was an isolated comment which the judge dealt with swiftly and decisively by issuing a curative instruction. Because a "motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial," Power v. State, 605 So.2d 856, 861 (Fla.1992), cert. denied, 507 U.S. 1037, 113 S.Ct. 1863, 123 L.Ed.2d 483 (1993), we find that the trial judge did not abuse his discretion in denying Gudinas' motion for mistrial.

Denial of Motion in Limine
Gudinas claims the trial court erroneously denied his motion in limine which averred that since the indictment charged only premeditated murder, the State should not argue nor should the jury be instructed concerning felony murder. We disagree.
We have repeatedly rejected claims that it is error for a trial court to allow the State to pursue a felony murder theory when the indictment gave no notice of the theory. Armstrong v. State, 642 So.2d 730, 737 (Fla. 1994), cert. denied, 514 U.S. 1085, 115 S.Ct. 1799, 131 L.Ed.2d 726 (1995); Lovette v. State, 636 So.2d 1304 (Fla.1994); Bush v. State, 461 So.2d 936 (Fla.1984), cert. denied, 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986).
Likewise, we agree with the State that the second sub-part of Gudinas' claim, that he was erroneously convicted of felony murder and the underlying felonies, is procedurally barred as it was not raised at trial.
*965 Even if it was preserved, this claim is wholly without merit because, in recently upholding our decision in State v. Enmund, 476 So.2d 165 (Fla.1985), we concluded that neither United States Supreme Court caselaw nor section 775.021(4), Florida Statutes (1991), "prohibits a Florida defendant from being separately convicted and sentenced for felony murder and the qualifying felony." Boler v. State, 678 So.2d 319, 322 (Fla.1996). Accordingly, Gudinas was properly convicted of both felony murder and the underlying felonies, two counts of sexual battery.

Presentation of Evidence
Gudinas claims the trial court erroneously restricted his presentation of the evidence, thus denying him a fair trial. Detective Griffin, the only witness called by Gudinas during his case-in-chief, testified that the police developed over four hundred leads in the case. One of the suspects was David Colbert, a man allegedly infatuated with Michelle McGrath. Gudinas claims that while Griffin testified about Colbert, the trial court "sustained numerous relevance objections by the State and thus restricted evidence of [his] defense." We disagree.
The record supports the State's assertion that it made only one relevance objection during Detective Griffin's testimony, which was overruled; three hearsay objections which were properly sustained; and an objection based on speculation, which was also properly sustained. We also agree with the State that the rules of evidence are not suspended because Gudinas chose to present only one witness in his guilt phase defense and forfeited his final closing argument. That was a tactical decision made at trial by Gudinas for which the trial court cannot now be found in error.
Furthermore, the trial court properly sustained the State's hearsay objections when the testimony did not come within any exception. Crump v. State, 622 So.2d 963 (Fla. 1993). In Crump, we affirmed the trial court's exclusion of a detective's interviews with other potential suspects on the ground that the substance of the interviews was hearsay that did not come within any of the hearsay exceptions. Id. at 969. Therefore, despite the fact that Crump was a capital case, we reaffirmed that the rules of evidence are still applicable during the defendant's presentation of his defense.
Finally, we agree with the State that Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), was limited to its facts due to the peculiarities of Mississippi evidence law which did not recognize a hearsay exception for declarations against penal interest. In Chambers, the Mississippi Supreme Court approved the exclusion of the testimony of three separate witnesses, who each would have testified to three statements made by Gable McDonald implicating himself as the murderer. Id. at 298. The court affirmed the trial court's ruling on the ground that this testimony was hearsay not within any exception. Id.
On review, the United States Supreme Court reversed, concluding "that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process." Id. at 302, 93 S.Ct. at 1049. The Supreme Court then stressed the narrowness of its holding, stating "we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and their procedures." Id. at 302-03, 93 S.Ct. at 1049.
In contrast, no such denial of due process occurred in this case. Gudinas was able to question Detective Griffin about David Colbert and any other potential suspects. Moreover, Detective Griffin testified that the police ultimately eliminated Colbert as a suspect. No exculpatory evidence was excluded which would have benefitted Gudinas' defense, denying him a fair trial in accordance with fundamental standards of due process. Thus, no Chambers issue exists and therefore Gudinas' claim is without merit.

HAC
Gudinas claims that the State failed to prove beyond a reasonable doubt that *966 Michelle McGrath was conscious during the attack. He argues that the evidence is just as consistent that she was unconscious, perhaps even brain dead, at the outset of the attack. Therefore, Gudinas asserts that the trial court abused its discretion in finding the heinous, atrocious, or cruel aggravating circumstance (HAC). We disagree.
Over the course of twelve pages, the trial court exhaustively laid out the aggravating circumstances, mitigating circumstances, supporting facts, and relevant testimony in its sentencing order. Regarding HAC, the trial court devoted three pages to Dr. Hegert's testimony detailing the injuries to Michelle McGrath. The testimony supports the State's theory that many if not all of the injuries, were inflicted before a blow to the head caused unconsciousness and eventually death. We believe the evidence is broad enough that a trier of fact could reasonably infer that the victim was conscious during the sexual batteries and other injuries that were inflicted upon her before her death. Therefore, we agree with the State that the trial court did not abuse its discretion in finding that the HAC aggravator was proven beyond a reasonable doubt. As in Wuornos v. State, 644 So.2d 1012, 1019 (Fla.1994), we affirm this finding since "the State's theory ... prevailed, is supported by the facts, and has been proven beyond a reasonable doubt."

Mitigating Evidence
Gudinas claims that the trial court improperly considered his proffered non-statutory mitigating evidence and erred in failing to find the "substantial impairment" mental mitigator and Gudinas' age of twenty years as statutory mitigators. We disagree.
We have stated that the "relative weight given each mitigating factor is within the province of the sentencing court." Campbell v. State, 571 So.2d 415, 420 (Fla. 1990). In this case, the trial court acted in conformance with our rule in Campbell that "a mitigating factor once found cannot be dismissed as having no weight." Id. The court properly considered each proffered non-statutory mitigator,[15] found that they were established by the evidence, and then concluded that the non-statutory mitigators warranted "very little weight." See Sims v. State, 681 So.2d 1112, 1119 (Fla.1996) (finding sentencing order adequate listing twentyfive nonstatutory mitigating factors where trial court accorded "little to no weight to each of them"), petition for cert. filed, No. 96-7631 (U.S. Jan. 22, 1997).[16] A review of the record reveals sufficient competent evidence to support the trial court's weighing of the non-statutory mitigation. Campbell; Brown v. Wainwright, 392 So.2d 1327 (Fla. 1981).
Furthermore, we agree with the State that the trial court did not abuse its discretion in rejecting as a statutory mitigator Gudinas' claim that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement was substantially impaired. In its sentencing order, the court acknowledged Dr. O'Brian's opinion that Gudinas' "ability to conform his behavior was impaired substantially on the *967 basis of alcohol and his underlying psychological makeup." The court then rejected Dr. O'Brian's opinion as "too heavily based upon unsupported facts from what he was told other witnesses were going to testify about concerning the issue of intoxication." The court then noted that no witnesses testified that Gudinas was "substantially impaired to the extent that he did not know what he was doing." Indeed, the court then cited "credible evidence" that Gudinas "stealthily approached" Rachelle Smith's car at approximately 2 a.m. and attempted to gain entry. Therefore, we agree with the State that the court did not abuse its discretion in rejecting this mitigator, especially considering the evidence cited in its sentencing order and adduced at trial. See Walls v. State, 641 So.2d 381, 390-91 (Fla.1994) (stating that opinion testimony "gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking"), cert. denied, 513 U.S. 1130, 115 S.Ct. 943, 130 L.Ed.2d 887 (1995).
We also agree with the State that the trial court did not abuse its discretion in rejecting Gudinas' age of twenty years as a statutory mitigator.[17] We have stated that the "fact that a murderer is twenty years of age, without more, is not significant." Garcia v. State, 492 So.2d 360, 367 (Fla.), cert. denied, 479 U.S. 1022, 107 S.Ct. 680, 93 L.Ed.2d 730 (1986). Furthermore, there is "no per se rule which pinpoints a particular age as an automatic factor in mitigation." Peek v. State, 395 So.2d 492, 498 (Fla.1980), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981). Although Gudinas is certainly correct that he had a troubling past and had always been small for his age, there was no evidence presented that he was unable to take responsibility for his acts and appreciate the consequences thereof at the time of the murders. We find substantial, competent evidence exists in the record to support the trial court's finding that Gudinas was mentally and emotionally mature enough that his age should not be considered as a mitigator.
Finally, Gudinas argues that death is a disproportionate sentence in his case, although he cites no cases similar to his own where this Court imposed life sentences. The State contends that this case resembles Mendyk v. State, 545 So.2d 846 (Fla.), cert. denied, 493 U.S. 984, 110 S.Ct. 520, 107 L.Ed.2d 521 (1989).
In Mendyk, the defendant and a friend abducted a woman, took her to a secluded area, removed her clothes, tied each of her legs to the legs of a sawhorse, and then sexually tortured her by several means, including insertion of a broom handle into her vagina. Id. at 847. The two men then took the woman to a different location and tied her with wire between two trees. They attempted to flee, but their truck became stuck on the side of the road. Mendyk told his accomplice, "I'm going to have to kill her." He then went to where the woman was tied up and strangled her. Id. at 848.
At trial, Mendyk was found guilty of firstdegree murder, two counts of sexual battery, and one count of kidnapping. Id. After the jury unanimously recommended death, the trial court imposed the death sentence, finding in aggravation that the murder was committed during a kidnapping and sexual battery; HAC; and CCP. Id. The trial court found one mitigating factor, Mendyk's age of twenty-one years. Id. On appeal, we affirmed the convictions and sentences.
We also recently affirmed the defendant's sentence of death in a case with remarkably similar facts as this case. Branch v. State, 685 So.2d 1250 (Fla.1996). In Branch, the female victim was accosted by the defendant as she returned to her car. Her nude body was later found nearby; she had been beaten, stomped, sexually assaulted and strangled. Id. at 1251. She suffered numerous bruises and lacerations, both of her eyes were swollen shut, and a wooden stick was broken off in her vagina. Id. After Branch *968 was convicted of first-degree murder, sexual battery, and grand theft, the jury voted ten to two for a sentence of death. Id. at 1252. The court followed the jury's advisory sentence after finding three aggravators[18] and several nonstatutory mitigators.[19]Id.
After considering the facts of Mendyk, Branch, and those of this case, we find Mendyk and Branch comparable. The only distinction we see between Mendyk and this case is that the victim in Mendyk was indisputably conscious during the sexual torture, while Gudinas challenges the State's contention that Michelle McGrath was conscious during the sexual attacks upon her. However, we believe that the medical examiner's testimony in this case provides powerful support to the State's theory of when Michelle McGrath lost consciousness and how and when she eventually died. Branch is even more persuasive, considering the like facts, identical aggravating circumstances, and similar mitigation. Accordingly, we find that Gudinas' death sentence is proportional to other cases in which sentences of death have been imposed. Branch; Mendyk.

CONCLUSION
In summary, we affirm Gudinas' convictions for first-degree murder, two counts of sexual battery, attempted sexual battery, and attempted burglary with an assault and we affirm his sentence of death.
It is so ordered.
OVERTON, SHAW, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which KOGAN, C.J., concurs.
ANSTEAD, Judge, concurring in part, dissenting in part.
I concur with the majority's resolution of all of Gudinas' claims of error except its approval of the trial court's cursory and superficial treatment of the extensive nonstatutory mitigation offered by the defendant. The sentencing order is inadequate and in direct violation of our explicit holdings in numerous cases requiring particularized treatment of mitigating factors.
In this case, the trial judge spent almost seven pages detailing the three statutory aggravators and one page substantiating the single statutory mitigator, while devoting one sentence to dismiss twelve separate and substantial nonstatutory mitigators as having "very little weight."[20] This summary disposition does not comport with the individualized "fair and deliberate consideration" we have required of trial courts in determining whether to impose a death sentence. Crump v. State, 654 So.2d 545, 547 (Fla.1995). Moreover, we are left uncertain as to what analysis, if any, the trial court employed before summarily combining all of the mitigation together as "this mitigating factor" and then concluding that the mitigation merited "very little weight."[21] That "analysis" is patently inadequate under our case law.
*969 A trial court's treatment of mitigating factors is not intended to be an academic exercise, particularly in a case such as this where substantial nonstatutory mitigation exists, especially Gudinas' drug and alcohol consumption the night of the murder, his personality disorders, his developmental impairment as a child, and his abused childhood. The trial court's cursory treatment of these nonstatutory mitigators precludes us from meaningfully reviewing the weighing process undertaken below. Ferrell v. State, 653 So.2d 367 (Fla.1995).
We have consistently held that the trial court must rigorously analyze all mitigating evidence. Campbell v. State, 571 So.2d 415 (Fla.1990). To that end, we recently reaffirmed that "mitigating evidence must be considered and weighed when contained anywhere in the record, to the extent it is believable and uncontroverted." Robinson v. State, 684 So.2d 175, 177 (Fla.1996). In Robinson, we reiterated that "the trial judge must carefully analyze all the possible statutory and nonstatutory mitigating factors against the established aggravators to ensure that death is appropriate." Id. at 177 (emphasis added).
To its credit, the trial court did a thorough job evaluating the evidence and justifying its findings concerning statutory aggravators and the one statutory mitigator. However, the analysis is not complete until the trial court "expressly evaluate[s] in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence." Campbell v. State, 571 So.2d 415, 419 (Fla. 1990) (footnote omitted) (emphasis added); see also Ferrell, 653 So.2d at 371 (emphasizing Campbell requirement that trial court "expressly evaluate ... each statutory and nonstatutory mitigating circumstance proposed by the defendant").
The existence of considerable aggravation does not absolve the trial court of its responsibility to thoroughly analyze all possible mitigating circumstances, especially those proffered by the defendant. In fact, such an order gives the appearance of a rush to judgment based upon the seven pages detailing the aggravation. Accordingly, since the trial court failed to expressly evaluate the extensive nonstatutory mitigation it found established by the evidence, I would remand this case to the trial court for a proper evaluation and weighing of each nonstatutory mitigating circumstance listed in the sentencing order as required by Campbell, Ferrell, and Robinson.
KOGAN, C.J., concurs.
NOTES
[1] Two other witnesses, Culbert Pressley and Mary Rutherford, also positively identified Gudinas from the same photo lineup. They had each seen Gudinas near the scene of the murder later that morning.
[2] Several hours later, shortly after 7 a.m., a man whom Pressley subsequently identified as Gudinas came walking down the sidewalk. When the man saw Pressley holding the car keys, he said, "Those look like my keys. I've been looking for them all morning." Pressley gave him the keys in exchange for a promised $50 reward. The man then walked away.
[3] Pace School employee Jane Brand discovered the victim in the alley. In the preceding half hour before seeing Michelle's body, Ms. Brand had arrived at school and encountered a young man inside the gated area on the steps leading to the school's front door. The man, whose back was to Ms. Brand, remained seated and did not look at her. She described him as about eighteen years old with short brown hair and wearing dark, loose-fitting shorts and a loose shirt. After being told to leave the school grounds, the man jumped the fence and ended up in the alley. About ten minutes later, Ms. Brand heard a loud crash in the alley. She looked outside and saw Michelle's body. She later identified Gudinas as the same man she saw in the courtyard that morning after seeing him in a television report.
[4] Gudinas' apartment was less than a half mile from where Michelle's car was found.
[5] These were Frank Wrigley, Todd Gates, and brothers Fred and Dwayne Harris. The Harris brothers are Gudinas' first cousins.
[6] His lengthiest treatment was a five-month program. He also spent nine days in a psychiatric ward during this time.
[7] The trial court found the following statutory aggravators: (1) the defendant had been convicted of a prior violent felony, section 921.141(5)(b), Fla.Stat. (1995); (2) the murder was committed during the commission of a sexual battery, section 921.141(5)(d); and (3) the murder was especially heinous, atrocious, or cruel, section 921.141(5)(h). The court found one statutory mitigator: the defendant committed the murder while under the influence of an extreme mental or emotional disturbance, section 921.141(6)(b). The court found the following nonstatutory mitigating factors and accorded them very little weight: (1) defendant had consumed cannabis and alcohol the evening of the homicide; (2) defendant had the capacity to be rehabilitated; (3) defendant's behavior at trial was acceptable; (4) defendant had an IQ of 85; (5) defendant was religious and believed in God; (6) defendant's father dressed as a transvestite; (7) defendant suffered from personality disorders; (8) defendant was developmentally impaired as a child; (9) defendant was a caring son to his mother; (10) defendant was an abused child; (11) defendant suffered from attention deficit disorder as a child; and (12) defendant was diagnosed as sexually disturbed as a child.
[8] The claims are: (1) the trial court erred in denying Gudinas' motion to sever counts I and II from the remaining charges; (2) the trial court erred in conducting several pretrial hearings without Gudinas present; (3) the trial court erred in not granting Gudinas' motion for judgment of acquittal for the attempted sexual battery of Rachelle Smith; (4) the trial court failed to conduct an adequate inquiry after Gudinas complained about lead counsel; (5) the trial court erred in overruling Gudinas' objections and allowing graphic slides into evidence; (6) the trial court erred in allowing the State to bolster a witness's testimony with a hearsay statement; (7) the introduction of collateral evidence denied Gudinas his constitutional right to a fair trial; (8) the trial court erred in denying Gudinas' motion in limine; (9) the trial court erred in restricting Gudinas' presentation of evidence; (10) the jury's advisory sentence was unconstitutionally tainted by improper prosecutorial argument and improper instructions; (11) the trial court erred in finding the heinous, atrocious, or cruel aggravating circumstance; and (12) the trial court erred in its consideration of the mitigating evidence.
[9] Gudinas is correct that the State's case is based on circumstantial evidence. However, even he admits that all the evidence points to him as the killer.
[10] Gudinas contends that Rachelle Smith's identification of him as her attacker was unduly prejudicial because she did not identify him as the man who attacked Michelle McGrath. However, as the State points out, Rachelle never claimed to identify Michelle's attacker, only her own. While Gudinas is certainly correct that Smith's testimony was prejudicial, all adverse testimony by its nature is prejudicial or it would not be offered. Smith's testimony was prejudicial to Gudinas' theory of the case because it provided similar fact evidence and placed Gudinas near the scene of the crime just prior to its commission.
[11] The approved procedure is:

If incompetency of counsel is assigned by the defendant as the reason, or a reason, the trial judge should make a sufficient inquiry of the defendant and his appointed counsel to determine whether or not there is reasonable cause to believe that the court appointed counsel is not rendering effective assistance to the defendant. If reasonable cause for such belief appears, the court should make a finding to that effect on the record and appoint a substitute attorney who should be allowed adequate time to prepare the defense. If no reasonable basis appears for a finding of ineffective representation, the trial court should so state on the record and advise the defendant that if he discharges his original counsel the State may not thereafter be required to appoint a substitute.
Nelson v. State, 274 So.2d 256, 258-59 (Fla. 4th DCA 1973).
[12] As we recently noted, a Nelson inquiry is not warranted where, as here, the record indicates that Gudinas' claim was essentially a general complaint about defense counsel's trial strategy and no formal allegation of incompetence was made. Branch v. State, 685 So.2d 1250 (Fla. 1996).
[13] At oral argument, the State estimated the distance from Michelle McGrath's car to the alley as being approximately fifty feet. On rebuttal, Gudinas' counsel did not dispute this estimate.
[14] Fred Harris had given a taped statement to the police several weeks after the murder.
[15] The relevant portion of the sentencing order provided:

1. The defendant had consumed cannabis and alcohol the evening of the homicide.
2. The defendant has capacity to be rehabilitated.
3. The defendant[`s] behavior at trial was acceptable.
4. The defendant has an IQ of 85.
5. The defendant is religious and believes in God.
6. The defendant's father dressed as a transvestite.
7. The defendant suffers from personality disorders.
8. The defendant was developmentally impaired as a child.
9. The defendant was a caring son to his mother.
10. The defendant was an abused child.
11. The defendant suffered from attention deficit disorders as a child.
12. The defendant was diagnosed as sexually disturbed as a child.
The Court finds this mitigating factor to be present, but gives it very little weight.
[16] We approved the following treatment of nonstatutory mitigation:

The Court has considered each of them carefully. The Court finds little to no weight to each of them. The Court finds that the aggravating circumstances in this case far outweigh the mitigating circumstances.
Sims, 681 So.2d at 1119.
[17] The trial court found as follows:

Age is only a mitigating circumstance when it is relevant to the defendant's mental and emotional maturity and his ability to take responsibility for his own acts and to appreciate the consequences resulting from them. There is no evidence that the defendant was not mentally and emotionally mature.
[18] The aggravators were murder committed in the course of a sexual battery; prior violent felony conviction; and HAC.
[19] The nonstatutory mitigators were the defendant's remorse; unstable childhood; positive personality traits; and acceptable conduct at trial.
[20] The relevant portion of the sentencing order provided:

The testimony established the following:
1. The defendant had consumed cannabis and alcohol the evening of the homicide.
2. The defendant has capacity to be rehabilitated.
3. The defendant[`s] behavior at trial was acceptable.
4. The defendant has an IQ of 85.
5. The defendant is religious and believes in God.
6. The defendant's father dressed as a transvestite.
7. The defendant suffers from personality disorders.
8. The defendant was developmentally impaired as a child.
9. The defendant was a caring son to his mother.
10. The defendant was an abused child.
11. The defendant suffered from attention deficit disorders as a child.
12. The defendant was diagnosed as sexually disturbed as a child.
The Court finds this mitigating factor to be present, but gives it very little weight.
[21] For purposes of clarity at the very least, the sentencing order requires revision to determine whether the trial judge considered the twelve nonstatutory mitigating factors in the aggregate when assigning "this mitigating factor ... very little weight," or if the judge was merely addressing the twelfth factor. Although the former interpretation is more likely, this confusion is another reason why we require trial courts to "expressly evaluate ... each mitigating circumstance proposed by the defendant." Campbell v. State, 571 So.2d 415, 419 (Fla.1990).