816 So.2d 1095 (2002)
Thomas Lee GUDINAS, Appellant,
v.
STATE of Florida, Appellee.
Thomas Lee Gudinas, Petitioner,
v.
Michael W. Moore, etc., et al., Respondents.
Nos. SC00-954, SC00-2495.
Supreme Court of Florida.
March 28, 2002.
Rehearing Denied May 7, 2002.
*1099 Bill Jennings, Capital Collateral Regional CounselMiddle, Peter J. Cannon, Assistant CCRC, Julius J. Aulisio, Assistant CCRC, and Leslie Anne Scalley, Staff Attorney, Capital Collateral Regional Counsel Middle Region, Tampa, FL, for Appellant/Petitioner.
Robert A. Butterworth, Attorney General, and Kenneth S. Nunnelley and Judy Taylor Rush, Assistant Attorneys General, Daytona Beach, FL, for Appellee/Respondent.
PER CURIAM.
Thomas Gudinas, a prisoner under the sentence of death, appeals an order entered by the trial court denying his postconviction motion filed pursuant to Florida Rule of Criminal Procedure 3.850. Gudinas also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const., art. V, § 3(b)(1)(9), Fla. Const. These cases have been consolidated. We affirm the trial court's denial of postconviction relief, and we deny habeas relief.
Gudinas was convicted of the first-degree murder and sexual battery of Michelle McGrath. A jury recommended death and the trial court sentenced him to death. The trial court found the following statutory aggravators: (1) the defendant had been convicted of a prior violent felony, section 921.141(5)(b), Florida Statutes (1995); (2) the murder was committed during the commission of a sexual battery, section 921.141(5)(d); and (3) the murder was especially heinous, atrocious, or cruel, section 921.141(5)(h). The court found one statutory mitigator: the defendant committed the murder while under the influence of an extreme mental or emotional disturbance, section 921.141(6)(b). The court found the following nonstatutory mitigating factors and accorded them very little weight: (1) defendant had consumed cannabis and alcohol the evening of the homicide; (2) defendant had the capacity to be rehabilitated; (3) defendant's behavior at trial was acceptable; (4) defendant had an IQ of 85; (5) defendant was religious and believed in God; (6) defendant's father dressed as a transvestite; (7) defendant suffered from personality disorders; (8) defendant was developmentally impaired as a child; (9) defendant was a caring son to his mother; (10) defendant was an abused child; (11) defendant suffered from attention deficit disorder as a child; and (12) defendant was diagnosed as sexually disturbed as a child.
We affirmed the murder conviction and death sentence. Gudinas v. State, 693 So.2d 953 (Fla.1997). We also affirmed his convictions for multiple counts of sexual battery, attempted sexual battery, and attempted burglary with an assault. The facts of the case and our resolution of the issues raised on appeal are set out in some detail in our prior opinion.
Gudinas timely filed a postconviction motion on June 5, 1998, an amended 3.850 motion in July of 1999, and a second amended motion on September 30, 1999. A Huff[1] preliminary hearing was held on October 15, 1999. The trial court granted an evidentiary hearing on three of the *1100 claims, which was held on December 17, 1999.[2] After the evidentiary hearing, the trial court entered a detailed order denying all of the claims in Gudinas's second amended 3.850 motion. Gudinas now appeals the denial of his claims and petitions separately for a writ of habeas corpus.

APPEAL
Gudinas raises numerous claims on appeal from the denial of his 3.850 motion.[3] Many of these claims may be disposed of without extensive discussion because we conclude they are procedurally barred,[4] without merit,[5] or conclusively refuted *1101 by the record.[6] The remaining claims, however, largely concerning effectiveness of counsel, warrant discussion, and we will address them in turn.

INEFFECTIVE ASSISTANCE OF COUNSEL
In order to successfully prove an ineffective assistance of counsel claim a defendant must establish the two prongs defined by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
466 U.S. at 687, 104 S.Ct. 2052. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052.
According to Strickland, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Strickland court also explained how counsel's actions should be evaluated:
Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. *1102 Id. at 691, 104 S.Ct. 2052. Upon review in this Court, ineffective assistance of counsel claims present mixed questions of law and fact subject to plenary review based on the Strickland test. See Stephens v. State, 748 So.2d 1028, 1032 (Fla.1999). While we give deference to the trial court's factual findings, we must conduct an independent review of the trial court's legal conclusions. State v. Riechmann, 777 So.2d 342, 350 (Fla.2000).

GUILT PHASE
In claim (2)(a), Gudinas alleges that the trial court erred in not finding that trial counsel was ineffective during the guilt phase for (1) agreeing to not argue the lack of DNA evidence if the State did not introduce any DNA evidence at trial, and (2) failing to subject semen and saliva that were discovered at the crime scene to DNA testing.
In denying this claim after hearing, the trial court concluded that Gudinas failed to produce any evidence as to what the results of the DNA testing would have been or how those results would have affected the earlier proceedings. The trial court also found the decision to forgo testing to be a strategic decision of Gudinas's trial counsel:
Mr. Irwin testified that he thought the forensic evidence was a double-edged sword, and that he did not want to bring out any more forensic evidence which would have implicated the Defendant. Mr. Irwin testified that he did not feel that it would have been worth the risk even to attempt to have a confidential analysis of the evidence.
Furthermore, at the evidentiary hearing, both defense counsel testified that their decisions as to what their trial strategy would be and whether they should pursue the testing of the physical evidence for DNA were influenced by the statements that the Defendant made to them. Mr. Irwin recalled the Defendant making the statement that Michelle McGrath's body was heavy as it was being pulled into the alleyway. Mr. LeBlanc testified that the Defendant made the statement that he recalled waking up in the presence of Ms. McGrath's body.
Applying the principles of Strickland, we find no error in the trial court's ruling that in light of Gudinas's incriminating statements to his attorneys and other inculpating physical evidence in the case, trial counsel's decisions were the type of reasonable, strategic decisions that the U.S. Supreme Court sought to permit in Strickland.
In this case, Gudinas's attorneys obtained information from their client that was indicative of his guilt. They formed what they perceived as an effective trial strategy for avoiding the risk because such testing might uncover more incriminating physical evidence against their client. Trial counsel's testimony and the law from Strickland support the trial court's decision.
We also find no error in the trial court's determination that Gudinas did not meet the prejudice prong of Strickland because Gudinas did not present evidence as to what the results of the DNA testing would have been or what effect the results would have had on the proceedings compared to the physical and other evidence of guilt, including his own inculpatory statements actually presented at trial. Accordingly, even assuming that trial counsel had been deficient, Gudinas has not shown that the trial court erred in not finding a reasonable probability of prejudice under Strickland. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.

*1103 PENALTY PHASE CLAIMS
The remainder of the issues on appeal concern counsels' alleged ineffectiveness during the penalty phase. In our prior opinion we described the penalty phase proceedings, including the extensive evidence of mitigation presented by defense counsel:
During the penalty phase, the State introduced certified copies of Gudinas' Massachusetts felony convictions. These included convictions for burglary of an automobile; assault; theft; assault with intent to rape; indecent assault and battery; and assault and battery. These offenses all occurred in the early 1990's.
Karen Ann Goldthwaite, Gudinas' mother, testified that she had a difficult pregnancy and delivery with Gudinas and that he had some health problems during the first six months of life. She also testified that he had extreme temper tantrums as a small boy, although he was never violent toward others. His teacher reported that he was hyperactive at school, sometimes throwing chairs and acting up. Mrs. Goldthwaite had Gudinas evaluated at Boston University when he was six. Thereafter, she sought help from the Massachusetts Division of Youth Services. Over the next several years, Gudinas had 105 different placements through that agency. Mrs. Goldthwaite was advised that Gudinas should be placed in a long-term residential program, but she was never able to accomplish this [Note 6]. Because of his treatment in numerous facilities, Gudinas only completed his formal education through the fourth grade, although he eventually attained his GED. He also was diagnosed as having a low IQ. Finally, Gudinas' mother testified that he began drinking alcohol while a juvenile, smoked marijuana, and had used cocaine and LSD.
[Note 6] His lengthiest treatment was a five-month program. He also spent nine days in a psychiatric ward during this time.
Michelle Gudinas, Gudinas' younger sister, testified that their father put Gudinas' hand over an open flame as punishment for playing with matches. She also testified that on another occasion, as punishment for wetting his bed, their father made Gudinas stand in front of their house in his underwear wearing a sign that said "I will not wet the bed." Ms. Gudinas noted that Gudinas had a good relationship with his stepfather. She denied ever having any sexual contact with her brother or telling anyone she had. However, in rebuttal, Emmitt Browning, an Orlando Police Department investigator, testified that Ms. Gudinas told him she was at a party and went into a bedroom with her brother. She allegedly said her brother lay on top of her and began tearing her swim suit off before some of their cousins entered the room and pulled Gudinas off her.
Dr. James Upson, a clinical neuropsychologist, testified for Gudinas. He concluded that Gudinas was seriously emotionally disturbed at the time of the murder and that the "symbolism" of the crime indicated that he was "quite pathological in his psychological dysfunction." Dr. Upson testified that Gudinas has an IQ of 85, in the low-average range. Testing revealed that Gudinas has very strong underlying emotional deficiencies. Dr. Upson explained that this type of person has a higher degree of impulsivity, sexual confusion and conflict, bizarre ideations, and manipulative behavior, tends to be physically abusive, and has the capacity to be violent. He noted that these behaviors escalate when the person is either threatened or loses control. Dr. Upson felt that Gudinas *1104 would probably be a danger to others in the future unless he was properly treated and that the murder was consistent with the behavior of a person with his psychological makeup.
Dr. James O'Brian, a physician and pharmacologist, was recognized by the trial court as an expert witness in the area of toxicology. He testified that Gudinas is unable to control his impulses in an unstructured environment and opined that Michelle's murder was impulsive. Gudinas told Dr. O'Brian that on the day before the murder, he ate marijuana "joints" at breakfast, at 1:30 p.m., five between 3 and 8 p.m., and another at 1 a.m. the following morning. Gudinas also reported that he drank alcohol between 1:30 and 3 p.m. and 9:30 p.m. and 2 a.m. the following morning. Dr. O'Brian testified that marijuana and alcohol remove inhibitions, thus allowing the underlying personality to show through. He stated that as the dosage increased, someone like Gudinas would not be able to control his "strong impulses." Based on his alcohol consumption and evaluation of Gudinas' underlying psychological makeup, Dr. O'Brian concluded that Gudinas' ability to conform his behavior to the requirements of the law was substantially impaired on the night of the murder.
Gudinas, 693 So.2d at 958-59.

WITNESS EVANS
In claim (3)(b), Gudinas alleges that trial counsel was ineffective during the penalty phase for failing to call Gudinas's maternal aunt, Ellen Evans, as a witness to present mitigating evidence. He relies on trial counsel's fundamental duty to conduct a reasonable investigation into the defendant's background for possible mitigating evidence. See Rose v. State, 675 So.2d 567, 571 (Fla.1996).
The Eleventh Circuit has succinctly outlined the analysis for determining whether counsel's failure to investigate and present mitigating evidence was deficient:

First, it must be determined whether a reasonable investigation should have uncovered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end. If, however, the failure to present the mitigating evidence was an oversight, and not a tactical decision, then a harmlessness review must be made to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Thus, it must be determined that defendant suffered actual prejudice due to the ineffectiveness of his trial counsel before relief will be granted.
Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir.1988) (citation omitted).
Gudinas contends that in addition to testifying about facts that were already in evidence, Ms. Evans had knowledge of specific events that were not previously presented at trial: (1) that Gudinas's mother drank heavily while she was pregnant with him and during his childhood; (2) that Gudinas's mother physically abused him; (3) that Gudinas's mother worked in a "massage parlor" where customers could receive oral sex; (4) that his mother was put into a mental institution when Gudinas was a child; (5) that while Gudinas was in a state institution at age thirteen or fourteen, he was raped; (6) that Gudinas can sometimes get a "blank stare"; (7) that he has suffered from a lifelong foot ailment that affects his gait; *1105 and (8) that his mother allowed her boyfriends to beat Gudinas.
In finding that prejudice had not been established on this claim, the trial court stated:
[E]ven if Ms. Evans' testimony had been presented during the sentencing phase of the Defendant's trial, it is clear that very little would have been added to the sentencing presentation of defense counsel. The evidence of the abuse by the Defendant's father and the fact that the Defendant's father cross-dressed were presented. There was also substantial evidence presented as to the difficulty of the Defendant's childhood and his lack of treatment by the Massachusetts Youth Services. Any additional evidence that could have been provided by Ms. Evans would not have altered the outcome.
In its order denying relief, the trial court found that much of Ms. Evans's testimony related to events that had already been raised during the penalty phase, i.e., that Gudinas's father was a cross-dresser, that Gudinas suffered physical abuse at the hands of his father, that Gudinas had a difficult childhood and that he was not properly treated by the Massachusetts Division of Youth Services (DYS). The trial court also concluded that had Ms. Evans testified, the additional family background she would have provided would still have inevitably been overwhelmed by the aggravating factors that were presented: that Gudinas had been previously convicted of a violent felony; that the murder was committed during the commission of a sexual battery; and that the murder was especially heinous, atrocious, or cruel. See Breedlove v. State, 692 So.2d 874, 878 (Fla.1997) (holding that even if mitigating circumstances had been established by the witnesses, the three aggravating factors the Court previously affirmed would have overwhelmed whatever mitigation Breedlove's friends and family members could provide).
At the 3.850 hearing, defense counsel LeBlanc testified that while he was researching Gudinas's background, he spoke several times with Ellen Evans to gather background information and that he considered what she told him in deciding what type of strategy to develop for the penalty phase. Defense cocounsel Irwin testified that he did not recall whether Ms. Evans was available to testify at trial. When asked at the 3.850 hearing why the defense did not call Ms. Evans during the penalty phase, Mr. LeBlanc stated that he did not remember. Ms. Evans testified that Gudinas's trial attorneys did not contact her but that if she had been contacted, she would have agreed to testify.
Although neither of Gudinas's attorneys were queried or gave a reason for why they did not call Ms. Evans to testify at trial, we note that this is not a case where counsel failed to investigate or present evidence of mitigation. Counsel did investigate the defendant's background and presented extensive evidence, including voluminous juvenile records, of his troubled childhood. We outlined the presentation of that evidence in our prior opinion. See Gudinas, 693 So.2d at 958-59. In fact, based upon counsel's presentation of mitigating evidence, the trial court found one substantial statutory mental mitigator as well as some twelve nonstatutory mitigators.
We find no error in the trial court's factual determination that Ms. Evans's testimony was in essence cumulative to the mitigation evidence actually presented at the penalty phase by experts and lay witnesses alike. In fact, much of Ms. Evans's 3.850 hearing testimony was similar to the mitigating evidence described in our previous opinion affirming the conviction and *1106 sentence. We cannot fault the trial court for not second-guessing defense counsels' work. While it was established that additional mitigating evidence existed, that is not the standard Strickland contemplates in evaluating counsel's performance. We also find no error in the trial court's determination that Gudinas has not demonstrated prejudice according to Strickland because he has not shown that if Ms. Evans had testified, her testimony would have provided a reasonable probability, sufficient to undermine confidence in the outcome, that the outcome of the proceeding would have been different. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.[7]

JUVENILE HISTORY
In claim (3)(c), Gudinas alleges that trial counsel was ineffective for failing to investigate and present more detail of Gudinas's institutional background with the DYS both directly and through mental health experts. He complains of counsel's failure to emphasize the lack of treatment he received as a juvenile. The trial court explained its evaluation of this claim:
[Dr. Upson] testified during sentencing and the evidentiary hearing as to the sufficiency of the records provided to him. Furthermore, the doctor conducted a psychological evaluation and screened the Defendant for neuropsychological factors. This evidence was presented to the jury during sentencing. The Court accepted Dr. Upson's testimony that the Defendant was severely disturbed as mitigating evidence. The Defendant has not shown what further effort of defense counsel could have been exerted.
... Although part of defense counsel's strategy was to emphasize that the Defendant was housed instead of treated, defense counsel testified that they did not want to present the Defendant's entire treatment history to the jury. The evidence presented by defense counsel was consistent with the defense strategy and gave the jury sufficient information without specifically asking what effect the 105 placements would have had on the Defendant. The Defendant made no showing of either deficient performance or prejudice as to this claim.
As the trial court noted and the record reflects, Gudinas's attorneys did, in fact, investigate his institutional background. The lawyers' testimony at the 3.850 hearing revealed that they were fully informed as to Gudinas's institutional background and made an informed choice to present his background in a limited fashion so as to paint him in the best possible light, as someone who was able to be rehabilitated, rather than someone who had rejected numerous attempts at rehabilitation.
Although the sentencing court accorded the nonstatutory mitigators very little weight, it did find that Gudinas had the capacity to be rehabilitated, which is a mitigator that trial counsel testified he did not want to undermine by emphasizing Gudinas's institutional history in Massachusetts, as unsuccessful as it was. Further, as the trial court noted, Dr. Upson testified at the 3.850 hearing that the additional institutional background information given to him before that hearing would not have changed the opinion he actually gave at trial. The trial court summarized the opinions that Dr. Upson gave at trial: "[T]hat the Defendant did not have any *1107 significant cognitive dysfunction; that he was severely disturbed and extremely frightened; that he was caught up in a perpetual cycle of being punished; that at least two instances of pretty severe abuse had occurred; and that he had a very disruptive childhood."
This Court has stated, "Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected." State v. Bolender, 503 So.2d 1247, 1250 (Fla.1987). Under this standard we cannot second-guess the trial court's determination after an evidentiary hearing that counsel was not deficient for not investigating and presenting Gudinas's institutional background in more depth and detail. Further, even if we assume counsel was deficient for not investigating and presenting Gudinas's institutional background more thoroughly, Gudinas has not demonstrated error in the trial court's determination that prejudice was not established, because he has not made a showing sufficient to undermine confidence in the outcome of the penalty phase proceeding. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
Accordingly, based upon review of the extensive evidence offered both at trial and in the postconviction hearing, we do not find that Gudinas has established error by the trial court in its treatment of this claim.

SUBSTANCE ABUSE
In claim (3)(d), Gudinas alleges that trial counsel was ineffective during the penalty phase for failing to present a ten-year history of drug and alcohol abuse and for failing to hire a neuropharmacologist. The trial court concluded that Gudinas did not suffer prejudice as to this claim. The trial court stated:
[T]he only new evidence that would have been provided by a neuropharmacologist such as Dr. Lipman was the Defendant's extensive history of drug and alcohol abuse and an explanation of the effect of drugs and alcohol on a person who suffered from attention deficit. Mr. LeBlanc testified that he was aware that the Defendant's background included a lot [sic] alcohol and drug use. This extensive history of substance abuse may have actually been damaging to the Defendant, and would not have altered the outcome of the jury's verdict. Moreover, the testimony that the use of drugs and alcohol by a person with attention deficit may have produced uncontrollable behavior is unpersuasive. The evidence clearly established that prior to the attack on Michelle McGrath, the Defendant was attempting to conceal himself when stalking Rachele [sic] Smith, and he fled when Ms. Smith honked the horn. This evidence shows that the Defendant was able to control himself. As such, the Court finds that the Defendant cannot demonstrate any prejudice which occurred as a result of the failure of defense counsel to present the testimony of a neuropharmacologist.
After reviewing the testimony provided by Dr. Joseph Lipman, the neuropharmacologist who testified at the 3.850 hearing for Gudinas, the trial court found that "the outcome of the earlier proceedings would have been unchanged as a result of his testimony." Upon review, we conclude that the trial court did not err in finding that confidence in the outcome of the original proceedings was not substantially undermined by counsel's failure to consult a neuropharmacologist.
Initially, we note, as we did in our earlier opinion, that defense counsel did present the testimony of Dr. James O'Brian, a physician and pharmacologist, at the penalty phase. Counsel also presented the testimony of Dr. James Upson, a clinical *1108 neuropychologist. At the 3.850 hearing, Dr. Lipman described his testing of Gudinas as "minimal" and based his opinions largely on Gudinas's self-report. The trial court concluded that Dr. Lipman's opinion that Gudinas has neuronal damage and a developmental brain problem conflicted with Dr. Upson's trial testimony. Further, the trial court found Dr. Upson's testimony more credible than Dr. Lipman's testimony in light of the extensive psychological testing that Dr. Upson conducted on Gudinas. Dr. Upson conducted a psychological evaluation of Gudinas, which required him to see Gudinas three times, totaling approximately nine and one-half hours. Hence, there is evidentiary support for the trial court's analysis and conclusion, and we find no error in its analysis and denial of this claim.[8]

SOCIAL WORKER
In claim (3)(e), Gudinas alleges that trial counsel was also ineffective during his penalty phase for failing to hire a social worker in addition to the mitigation experts that were retained. Gudinas called clinical social worker Jan Vogelsang to testify at the 3.850 hearing. The trial court reviewed trial counsel's testimony and Ms. Vogelsang's testimony in its denial of this claim, stating:
Mr. Irwin testified at the evidentiary hearing that he did not hire a social worker because he did not see where they [sic] could be of any help, and because as a matter of strategy he did not want to present all of the Defendant's placement history and background. Mr. LeBlanc testified that in light of his experience he would hire a social worker in the same circumstance today.
... Ms. Vogelsang did not present any information or opinion which differed from that already presented at the earlier proceedings.
The record is undisputed that counsel did hire and consult with mental health experts for the purpose of determining the effect of Gudinas's social history on his life and this case. Counsel cannot be found ineffective for failing to provide cumulative evidence. See Card v. State, 497 So.2d 1169, 1175 (Fla.1986). Additionally, the decision to hire a social worker appears to be second-guessing by current counsel, rather than identification of a defect in trial counsel's strategy. The Strickland Court acknowledged, "Even the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689, 104 S.Ct. 2052. Further, this Court has stated, "The standard is not how present counsel would have proceeded, in hindsight, but rather whether there was both a deficient performance and a reasonable probability of a different result." Cherry v. State, 659 So.2d 1069, 1073 (Fla.1995).
The trial court also determined that even if trial counsel was ineffective for not hiring a social worker for the penalty phase, Gudinas has not demonstrated prejudice in view of the mental health and other mitigating evidence actually presented. As the trial court stated, "The testimony of Ms. Vogelsang would have been cumulative ... and her testimony at the evidentiary hearing did not establish what further input she could have provided."
*1109 We again find no error in the trial court's conclusion that Gudinas has not shown, in view of the expert testimony that was offered, how having a social worker at his trial in addition to the evidence that was presented would have provided a reasonable probability, sufficient to undermine confidence in the outcome, that the proceeding would have been different. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.

DR. O'BRIAN
In claim (3)(g), Gudinas alleges that trial counsel was ineffective during his penalty phase for failing to provide pharmacologist Dr. James O'Brian with necessary background information. At trial, Dr. O'Brian opined that on the night of the murder, Gudinas's ability to conform his behavior to the requirements of the law was impaired substantially on the basis of the alcohol and his underlying psychological makeup. On cross-examination, he admitted that he was not given the actual trial testimony of the witnesses, but rather he conceded he relied upon defense counsel who told him that other witnesses said Gudinas was intoxicated.
At the 3.850 hearing, attorney Irwin stated that he could not recall why Dr. O'Brian did not sit through the actual trial testimony, but he thought that it had to do with the fact that Dr. O'Brian was from Connecticut. Mr. Irwin stated that he would have preferred to have Dr. O'Brian sit in on the trial, but instead they had phone conversations where he kept Dr. O'Brian abreast of the witnesses' trial and deposition testimony.
In the sentencing order, the trial court rejected the mitigator that the capacity of Gudinas to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The trial court cited to four reasons for rejecting the mitigator. One of the reasons was that Dr. O'Brian's testimony on this issue was not sufficient to establish the mitigator because it was "too heavily based upon unsupported facts from what he was told other witnesses were going to testify about concerning the issues of intoxication."
The reliability of Dr. O'Brian's testimony was not the only reason that the trial court rejected the mitigator that the capacity of Gudinas to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The trial court stated in the sentencing order that it was not convinced that this mitigating circumstance existed for three other reasons: (1) no witnesses who saw Gudinas that night testified that he was substantially impaired to the extent that he did not know what he was doing; (2) Gudinas stealthily approached Rachelle Smith's car and attempted to gain entry to her vehicle, but fled once she sounded the horn; and (3) when Gudinas attacked Michelle McGrath, he took her to a place of concealment to perpetrate acts on her. In its denial of this 3.850 claim, the trial court stated that "there was no further evidence presented at trial which would have provided a better foundation for [Dr. O'Brian's] opinion." Because a number of circumstances unrelated to Dr. O'Brian's testimony persuaded the trial court that this statutory mitigator was not present, we find no error in the trial court's determination that Gudinas has not shown that there is a reasonable probability, sufficient to undermine confidence in the outcome, that but for counsel's errors, the proceeding would have been different. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.

SISTER'S TESTIMONY
In claim (3)(h), Gudinas alleges that trial counsel was ineffective during his *1110 penalty phase for calling Gudinas's sister, Michelle Gudinas, to testify because by calling her to testify, defense counsel opened the door to testimony regarding an alleged incident in which Gudinas attempted to sexually assault her.
At trial, Michelle Gudinas testified that: (1) their father purposely burned Gudinas's hand on a hot electric stove burner; (2) their father made Gudinas stand outside in the cold wearing a sign that said something like, "I will not wet the bed"; (3) their father was a cross-dresser; and (4) their father once beat Gudinas by banging his head against a wall. During the State's cross-examination of Michelle at trial, she denied that the incident was an attempted sexual assault and stated that Gudinas was trying to protect her. The State called a rebuttal witness, Orlando police officer Emmitt Browning, who testified that when Michelle was thirteen or fourteen years old, she advised him that she was at a party and that after becoming intoxicated, she went into a bedroom with her brother and the next thing she could remember was her brother on top of her and her bathing suit torn off. According to Officer Browning, Michelle related that someone came in and caught them and pulled Gudinas off of her.
At the 3.850 hearing, attorney Irwin stated that he called Michelle to testify because she wanted to take the stand and he felt "almost an obligation" to let her speak on behalf of her brother, who was facing the death penalty. Despite Gudinas's assertion of counsel's ineffectiveness for calling Michelle to testify, it does not appear he has established the prejudice prong on this claim. As the trial court observed, this same information had already reached the jury during the State's cross-examination of Dr. Upson.[9] For these reasons, we find no error in the trial court's determination that there was not a reasonable probability, sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052.

DNA
As a final matter, we address Gudinas's claim (1)(b), alleging that the trial court erred when it denied his motion filed on May 18, 1999, for an order directing the State to release physical evidence found at the murder scene for DNA testing using the polymerase chain reaction (PCR) method. The trial court held a hearing on the motion on June 1, 1999, and denied the motion in a written order filed on June 23, 1999.
PCR DNA testing was available at the time of Gudinas's trial, but the semen and saliva samples were not released for DNA testing, in accordance with defense's trial strategy, as previously discussed in this opinion. This Court has held that in order to prevail in a newly discovered evidence claim, it must be "of such nature that it would probably produce an acquittal on retrial." Jones v. State, 591 So.2d 911, 915 (Fla.1992). The court stated that to come to that conclusion, a trial court "will necessarily have to evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." Id. at 916. This standard also applies to cases in which the defendant alleges that evidence should be reexamined using modern procedures. See Zeigler v. State, 654 So.2d 1162, 1164 (Fla.1995).
*1111 The trial court denied the motion because: (1) at trial, the State and defense agreed not to use DNA evidence for any purpose; (2) there was substantial objective evidence inculpating Gudinas; (3) the request was untimely and speculative as in Zeigler; and (4) the law will not sanction allowing a defendant to reopen evidence merely due to advances in technology absent "facts strongly indicating that the new test would overcome the evidence supporting jury's conviction." Upon our review, especially in view of trial counsel's testimony, we find no error in the trial court's determination that Gudinas did not establish a sufficient basis for DNA testing.[10]

HABEAS CORPUS
In the petition for writ of habeas corpus, Gudinas alleges: (1) appellate counsel performed deficiently by failing to raise the majority of the prosecutor's improper comments during closing argument; (2) appellate counsel was ineffective for failing to raise the trial court's errors in rejecting the statutory mitigator that Gudinas's ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired; (3) appellate counsel was ineffective for failing to raise the issue of the trial court's refusal to sever counts I and II from the remaining charges; (4) Florida's capital felony sentencing statute as applied is unconstitutional under the Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution; (5) appellate counsel was ineffective for failing to effectively litigate the combination of procedural and substantive errors that deprived Gudinas of a fair trial; and (6) Gudinas's Eighth Amendment right against cruel and unusual punishment will be violated because he may be incompetent at the time of execution.
We conclude that claims 1, 2, and 3 are not proper claims for habeas corpus relief as they were actually raised and denied on direct appeal. See Gudinas, 693 So.2d at 959-67. "[H]abeas corpus petitions are not to be used for additional appeals on questions which could have been, should have been, or were raised on appeal or in a rule 3.850 motion, or on matters that were not objected to at trial." Parker v. Dugger, 550 So.2d 459, 460 (Fla.1989). This Court rejected the same issue as raised in claim 4 in Mills v. Moore, 786 So.2d 532, 537 (Fla.2001). Further, since we have determined that no substantial errors occurred at trial, we find claim 5 without merit. Finally, claim 6 is not yet ripe for consideration pursuant to this Court's holding in Hall v. Moore, 792 So.2d 447, 450 (Fla.2001).[11]
Based on the foregoing, we affirm the trial court's denial of 3.850 relief and deny habeas corpus relief.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
NOTES
[1] Huff v. State, 622 So.2d 982 (Fla.1993).
[2] In the order setting evidentiary hearing filed October 28, 1999, the trial court granted an evidentiary hearing in claims I(c), II, and IV.
[3] The claims are: (1) Gudinas was denied a full and fair evidentiary hearing: (a) the trial court erred by denying Gudinas's motions to continue; (b) the trial court erred by denying Gudinas's motion to release physical evidence; (2) the trial court erred by denying guilt phase ineffective assistance of counsel claims: (a) trial counsel was ineffective for failing to subject samples of semen and saliva to DNA testing; (b) trial counsel was ineffective for failing to adequately cross-examine two witnesses; (c) trial counsel was ineffective for failing to object to the introduction of a bloody T-shirt; (3) the trial court erred by denying penalty phase ineffective assistance of counsel claims: (a) trial counsel was ineffective for failing to contemporaneously object to prosecutorial misconduct; (b) trial counsel was ineffective for failing to call Ellen Evans as a witness; (c) trial counsel was ineffective for failing to investigate Gudinas's institutional background; (d) trial counsel was ineffective for failing to present a ten-year history of drug and alcohol abuse and for failing to hire a neuropharmacologist; (e) trial counsel was ineffective for failing to hire a social worker; (f) trial counsel was ineffective for failing to present evidence of mental and emotional immaturity; (g) trial counsel was ineffective for failing to provide Dr. O'Brian with necessary testimony; (h) trial counsel was ineffective for calling Gudinas's sister to testify; (i) trial counsel was ineffective for failing to contemporaneously object to the jury instruction about the "during the commission of a felony" instruction; (j) trial counsel was ineffective for not objecting to the impermissible burden shift to Gudinas; (k) trial counsel was ineffective for failing to object to the jury instruction involving the heinous, atrocious, or cruel aggravator; (4) the trial court erred in summarily denying the claim that Rule Regulating the Florida Bar 4-3.5(d)(4) is unconstitutional; (5) the trial court erred in summarily denying the claim that Gudinas was deprived of a fair trial due to a combination of substantive and procedural errors.
[4] Claim (4) is procedurally barred because it could have been raised on direct appeal. See Harvey v. Dugger 656 So.2d 1253, 1256 (Fla. 1995). Gudinas phrases claims (3)(a) and (3)(f) as allegations of ineffective assistance of counsel. However, these claims, or variations of them, were substantively raised on direct appeal and rejected.

Claims (3)(j) and (3)(k) consist of ineffective assistance of counsel claims that revolve around substantive issues that could have been, but were not, raised on direct appeal. These claims are procedurally barred because they do not involve fundamental error and are subject to the same rule that 3.850 proceedings are not to be used as a second appeal.
In claim (3)(i), Gudinas attempted to attach an ineffective assistance of counsel allegation to this claim for the first time on appeal. This claim is procedurally barred because a defendant cannot raise the ineffective assistance of counsel claim for the first time on appeal. See Doyle v. State, 526 So.2d 909, 911 (Fla. 1988).
[5] We conclude that claim (1)(a) is without merit because the granting of a continuance is subject to an abuse of discretion standard, and Gudinas has not shown that the trial court's ruling on the continuance resulted in undue prejudice to him. See Kearse v. State, 770 So.2d 1119, 1127 (Fla.2000). The record reflects that Gudinas's counsel was able to prepare and participate in a meaningful 3.850 evidentiary hearing. At the hearing, Gudinas called several witnesses and examined them in depth and at length about numerous issues included in the 3.850 motion. No showing has been made that Gudinas was prejudiced in fact by the denial of a continuance.

Claim 5 alleges cumulative error. We find this claim to be without merit, as we have determined herein that no errors occurred. See Downs v. State, 740 So.2d 506, 509 (Fla. 1999).
[6] The trial court summarily denied claims (2)(b) and (2)(c), stating that from the record, it was apparent that Gudinas had not established deficient performance or prejudice in those claims. In issues that did not receive an evidentiary hearing, we must accept the factual allegations made by the defendant to the extent that they are not refuted by the record. See Peede v. State, 748 So.2d 253 (Fla.1999); Valle v. State, 705 So.2d 1331 (Fla.1997). However, we have reviewed the claims and find that although they were legally sufficient on their face, the trial court did not err in concluding that they were conclusively refuted by the record.
[7] In the sentencing order, the trial court found the following mitigators that related to Gudinas's upbringing and family life: (1) that his father dressed as a transvestite; (2) that he was developmentally impaired as a child; (3) that he was a caring son to his mother; and (4) that he was an abused child. The trial court gave "very little weight" to the nonstatutory mitigating factors relating to Gudinas's family life and upbringing.
[8] In its denial of this claim, the trial court also noted that defense counsel was unable to present reliable evidence to corroborate Gudinas's claim that he used LSD on the night of the murder. We find no error in the trial court's conclusion in view of the lack of corroborating evidence to support the claim that Gudinas ingested LSD on the night of the murder.
[9] Dr. Upson testified at trial that his investigation revealed that a sexual act was committed between Gudinas and his fourteen-year-old sister on one occasion when five people were at one person's apartment.
[10] We are aware that Gudinas may elect to file a similar motion for DNA testing pursuant to section 925.11, Florida Statutes (2001), which became effective on October 1, 2001. However, we do not comment on the application of that statute here.
[11] We commend Judge Belvin Perry on his comprehensive order that explained in detail his factual findings and reasoning in denying each claim. This type of detailed order greatly assists this Court in performing its appellate review of postconviction proceedings.