# Supreme Court of Florida

_____

No. SC2025-0794

_____

**THOMAS LEE GUDINAS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

June 17, 2025

PER CURIAM.

Thomas Lee Gudinas, a prisoner under sentence of death for whom a warrant has been signed and an execution set for June 24, 2025, appeals the circuit court's orders summarily denying his third successive motion for postconviction relief, which was filed under Florida Rule of Criminal Procedure 3.851, and denying his demand for public records, which was made under rule 3.852. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the denials of postconviction relief and the

demand for public records. Additionally, we deny Gudinas's motion for a stay of execution, filed on June 8, 2025.

## I. BACKGROUND

After leaving an Orlando bar in the early morning hours of May 24, 1994, Gudinas sexually battered and murdered M.M.[1] The victim's body was found in a nearby alley, naked, except for a bra that was pushed up above her breasts. There were sticks inserted into her genitalia, and it was also determined that she had been vaginally and anally penetrated by something other than the sticks. Gudinas admitted to his roommates that he killed the victim and then had sex with her body. The medical examiner determined that the victim's cause of death was a brain hemorrhage resulting from blunt force injuries to her head, probably inflicted by a stomping-type blow from a boot. Gudinas was convicted of the victim's murder and two counts of sexual battery. He was also convicted of attempted burglary with an assault and attempted sexual battery against a second woman, whom he had attempted to attack after

---

1. A more complete recitation of the facts can be found in this Court's opinion on direct appeal. *See Gudinas v. State*, 693 So. 2d 953 (Fla. 1997).

leaving the bar and before murdering M.M. *Gudinas v. State*, 693 So. 2d 953, 956-57 (Fla. 1997).

At the penalty phase, the State introduced evidence of Gudinas's prior felony convictions from Massachusetts, including burglary of an automobile; assault; theft; assault with intent to rape; indecent assault and battery; and assault and battery. Gudinas's mother testified about his behavioral and substance abuse problems in his youth and his "low IQ." Gudinas's sister testified about the abuse he suffered at the hands of his father. Dr. James Upson, a clinical neuropsychologist, testified that Gudinas was seriously emotionally disturbed at the time of the murder and that he was "quite pathological in his psychological dysfunction." Dr. Upson testified that Gudinas has an IQ of 85, and that the murder was consistent with the behavior of a person with his psychological makeup. Dr. James O'Brian, a physician and pharmacologist, testified that Gudinas is unable to control his impulses in an unstructured environment and was unable to control them at the time of the murder due to his marijuana and alcohol consumption. The jury recommended and the trial court ultimately imposed a sentence of death for the murder based on

three aggravating circumstances,[2] one statutory mitigating

circumstance,[3] and twelve "nonstatutory" mitigating

circumstances.[4]  *Id.* at 958-59.

This Court affirmed Gudinas's convictions and sentences on

direct appeal, *id.* at 968, which became final when the United

States Supreme Court denied certiorari review in 1997, *Gudinas v.*

---

2.  The court found that the following aggravating circumstances had been proven beyond a reasonable doubt: (1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; (2) the capital felony was committed while the defendant was engaged in the commission of a sexual battery; and (3) the capital felony was especially heinous, atrocious, or cruel.

3.  The court found one statutory mitigating circumstance established: the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.

4.  The court found the following "nonstatutory" mitigating circumstances established: (1) the defendant had consumed cannabis and alcohol the evening of the homicide; (2) the defendant has capacity to be rehabilitated; (3) the defendant's behavior at trial was acceptable; (4) the defendant has an IQ of 85; (5) the defendant is religious and believes in God; (6) the defendant's father dressed as a transvestite; (7) the defendant suffers from personality disorders; (8) the defendant was developmentally impaired as a child; (9) the defendant was a caring son to his mother; (10) the defendant was an abused child; (11) the defendant suffered from attention deficit disorder as a child; and (12) the defendant was diagnosed as sexually disturbed as a child.

- 4 -

*Florida*, 522 U.S. 936 (1997); *see* Fla. R. Crim. P. 3.851(d)(1)(B) ("For the purposes of this rule, a judgment is final . . . on the disposition of the petition for writ of certiorari by the United States Supreme Court, if filed."). In the decades since, Gudinas has unsuccessfully challenged his convictions and sentences in state and federal courts. *See Gudinas v. State*, 816 So. 2d 1095, 1099-1100 (Fla. 2002) (affirming denial of Gudinas's initial motion for postconviction relief and denying his state petition for a writ of habeas corpus); *Gudinas v. State*, 879 So. 2d 616, 617 (Fla. 2004) (affirming the denial of Gudinas's first successive motion for postconviction relief); *Gudinas v. State*, 982 So. 2d 684 (Fla. 2008) (denying Gudinas's pro se Petition Seeking Review of Non-Final Order in Death Penalty Postconviction Proceeding Pursuant to Rule 9.142(b)); *Gudinas v. McNeil*, No. 2:06-cv-357-FtM-36DNF, 2010 WL 3835776, at *65 (M.D. Fla. Sept. 30, 2010) (denying Gudinas's federal petition for a writ of habeas corpus), *aff'd sub nom. Gudinas v. Sec'y, Dep't of Corr.*, 436 Fed. App'x 895 (11th Cir. 2011); *Gudinas v. Tucker*, 565 U.S. 1247 (2012) (denying certiorari review of the denial of federal habeas relief); *Gudinas v. State*, 235 So. 3d

303, 304 (Fla. 2018) (affirming denial of Gudinas's second successive motion for postconviction relief).

Governor Ron DeSantis signed Gudinas's death warrant on May 23, 2025. Gudinas then filed a third successive motion for postconviction relief under rule 3.851, raising three claims: (1) Gudinas's lifelong mental illnesses place him outside the class of individuals who should be put to death, and executing him will be violative of the Eighth Amendment to the United States Constitution and the corresponding provisions of the Florida Constitution; (2) Florida's use of its unique and obstructive "conformity clause" is unconstitutional and violates Gudinas's Fourteenth Amendment due process rights and his Eighth Amendment right to a true merits-based evaluation of his claims, premised on the evolving standards of decency that mark the progress of a maturing society; and (3) applying the procedural bar in Florida Rule of Criminal Procedure 3.851(d)(2) to Gudinas's Claim One would violate his Fourteenth Amendment due process rights, his Eighth Amendment right to a true merits-based evaluation of his claims, premised on the evolving standards of decency that mark the progress of a maturing society, and his Sixth Amendment right to counsel. The

circuit court summarily denied all three claims, as well as Gudinas's demand for public records from the Executive Office of the Governor.  This appeal followed.

## II.  ANALYSIS

### A.  Newly Discovered Evidence/Extension of *Roper*/Extension of *Atkins*

In his first issue on appeal, Gudinas argues that the circuit court erred in summarily denying his claim that his unspecified lifelong mental illnesses place him outside the class of individuals who should be put to death.  Gudinas claims that an evaluation conducted by Dr. Hyman Eisenstein, a neuropsychologist, on May 29, 2025, provides newly discovered evidence of "brain impairment."[5]  He also contends that "Dr. Eisenstein finds that Gudinas's age at the time of crime, a little over twenty [years], is

---

5.  In the appendix to the initial brief, Gudinas includes writings that were apparently composed by him before the instant proceedings, and presumably intended to support statements contained in Dr. Eisenstein's report, but which were not submitted to the circuit court.  We decline to consider materials that were not presented to and considered by the circuit court.  *See, e.g.*, *Altchiler v. State*, 442 So. 2d 349, 350 (Fla. 1st DCA 1983) (stating it is elemental that an appellate court may not consider material matters outside the record).

similar to [United States Supreme Court] precedent barring

juveniles from execution," although he does not categorize this as

newly discovered evidence, and Dr. Eisenstein, in fact, made no

such "finding."[6]  Gudinas argues that he is entitled to an

evidentiary hearing to prove that due to "evolving standards of

decency that mark the progress of a maturing society," he should be

deemed outside the class of individuals subject to capital

punishment.

Similar to a number of other recent post-warrant arguments,

Gudinas's argument is essentially that because of his mental

illnesses and "brain impairment" and the fact that he was twenty

years old when he committed the murder, the protections of *Atkins*

---

6.  Dr. Eisenstein made no mention of any Supreme Court precedent, nor did he compare Gudinas's case or circumstances to that of any other defendant.  The only mention in Dr. Eisenstein's evaluation report of Gudinas's age was made in the "Summary & Conclusions" section and states:

> Gudinas was twenty years old at the time of the commission of the offense.  Developmental literature and neuroscience research states that there was a lack of maturity, an undeveloped sense of responsibility, increased vulnerability and susceptibility to outside negative influences in a person that was not fully formed at this age.

*v. Virginia*, 536 U.S. 304 (2002)—which held that the Eighth Amendment prohibits execution of the intellectually disabled—and *Roper v. Simmons*, 543 U.S. 551, 578 (2005)—which held that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed"—should be extended to him, and that these claims should be entertained at this late stage because Dr. Eisenstein's May 30, 2025, evaluation report constitutes newly discovered evidence. The circuit court summarily denied this claim as untimely, procedurally barred, and without merit.

Rule 3.851 requires that "[a]ny motion to vacate judgment of conviction and sentence of death shall be filed by the defendant within 1 year after the judgment and sentence become final." Fla. R. Crim. P. 3.851(d)(1). But there is an exception to this rule for claims involving newly discovered evidence—i.e., claims predicated on facts that "were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence." Fla. R. Crim. P. 3.851(d)(2)(A). "[A]ny claim of newly discovered evidence in a death penalty case must be brought within one year of the date such evidence was discovered or could have

- 9 -

been discovered through the exercise of due diligence." *Glock v. Moore*, 776 So. 2d 243, 251 (Fla. 2001). In order to obtain relief based on a claim of newly discovered evidence, a defendant has the burden to establish:

> (1) that the newly discovered evidence was unknown by the trial court, by the party, or by counsel at the time of trial and it could not have been discovered through due diligence, and (2) that the evidence is of such a nature that it would probably produce an acquittal or yield a less severe sentence on retrial.

*Dailey v. State*, 329 So. 3d 1280, 1285 (Fla. 2021).

Although his convictions and sentences became final nearly thirty years ago, Gudinas asserts that his claim is based on newly discovered evidence and is therefore timely under the exception in rule 3.851(d)(2)(A) to the one-year time limit for postconviction claims. Gudinas summarily states that "[t]he newly discovered evidence is an evaluation conducted by Dr. Hyman Eisenstein, a neuropsychologist who evaluated Gudinas at Florida State Prison on May 29, 2025." He alternately states that the evaluation is newly discovered evidence of "brain impairment" and "mental impairments." It appears that Gudinas is using "brain" and "mental" interchangeably rather than arguing that there are two

- 10 -

different claims of newly discovered evidence, but he does not elaborate as to what kind of brain or mental impairment he believes has recently been discovered.

Dr. Eisenstein's report does not use the term "mental impairments," and the only reference to "brain impairment" in the report is a single conclusory statement in the section titled "Summary & Conclusions" that Gudinas "presented with significant brain impairment and frontal lobe dysfunction." But Gudinas admits in his briefing that evidence of his "mental impairment" was presented during the penalty phase of his trial and "more" evidence was presented during the evidentiary hearing on his initial motion for postconviction relief. He describes his "impairments" in his initial brief here as "life-long" and "in place at the time of the crimes." With regard to the specific possibility of "frontal lobe dysfunction," Dr. Joseph Lipman, a neuropharmacologist retained by Gudinas during the initial postconviction proceedings, reported in 1999 that Gudinas may have "deficits of frontal or temporal lobe function in his brain." That Gudinas may have "brain impairment" or "frontal lobe dysfunction" has been known to him for at least twenty-five or thirty years, if not longer, and has been raised

- 11 -

previously. We therefore cannot determine what exactly it is that Gudinas believes is newly discovered.

Moreover, even if we were to assume that Dr. Eisenstein's finding of "brain impairment" is newly discovered, to raise a facially sufficient claim based on newly discovered evidence, it is necessary to assert not only that there is evidence that was not and could not have been known at the time of trial by the use of due diligence but also that the evidence is of such a nature that it would probably produce a life sentence on retrial. *Damren v. State*, 397 So. 3d 607, 610 (Fla. 2023), *cert. denied*, 144 S. Ct. 1398 (2024). Gudinas has not done this. His failure to identify any evidence that was not previously presented and his failure to plead that whatever it is that he believes is newly discovered would probably produce an acquittal at retrial are fatal to any argument that this claim may be timely under rule 3.851(d)(2)(A).

Gudinas's contention that this claim is timely because he had "no reason to have a new mental health evaluation until the commencement of his clemency proceedings, and most specifically, the signing of the death warrant" is also without support. Neither clemency proceedings nor the signing of his death warrant has

anything to do with the timeliness of Gudinas's claim that he is exempt from execution under the Eighth Amendment due to "brain impairment."

The circuit court was also correct in concluding that this claim is procedurally barred. Gudinas first introduced the possibility of "brain impairment" at the penalty phase in 1995 through his expert, Dr. Upson. Dr. Upson testified that despite extensive evaluation and testing, he found no evidence of neuropsychological impairment on either side or the frontal portion of Gudinas's brain and "ruled out" neuropsychological impairment. Dr. Upson also testified that Gudinas's mental health records indicated that he had been evaluated by neuropsychologists on several prior occasions, none of whom found any indication of "brain impairment" or organic brain damage, although the records did indicate that Gudinas has "significant emotional disturbances." The trial court considered Dr. Upson's testimony credible and relied on it to find mitigating circumstances in the sentencing order, including the statutory mitigating circumstance of extreme mental or emotional disturbance.

Dr. Upson testified again at the evidentiary hearing on Gudinas's initial motion for postconviction relief in 1999, at which time he maintained his opinion that Gudinas had no significant cognitive dysfunction. Despite contrary testimony at that hearing from Dr. Lipman "that Gudinas has neuronal damage and a developmental brain problem," the postconviction court concluded—a conclusion that this Court affirmed on appeal—that there was no reasonable probability that Gudinas would have received a life sentence had Dr. Lipman presented that opinion at trial due to the conflicting and more credible evidence presented by Dr. Upson. *Gudinas*, 816 So. 2d at 1107-08.

Because the current claim of "brain impairment" is a variation of his prior claim that trial counsel was ineffective for failing to present a neuropharmacologist who would have testified that Gudinas has "neuronal damage and a developmental brain problem," it is procedurally barred. Moreover, even if it were not a variation of a prior claim, because Gudinas's alleged "brain impairment" in the form of "neuronal damage and a developmental brain problem" was known at the time of his postconviction proceedings, more than a quarter of a century ago, this claim would

- 14 -

still be procedurally barred because it should have been raised previously. *See Rogers v. State*, No. SC2025-0585, 2025 WL 1341642, at *4 (Fla. May 8) ("[I]n an active warrant case, a postconviction claim that could have been raised in a prior proceeding is procedurally barred."), *cert. denied*, No. 24-7169, 2025 WL 1387828 (U.S. May 14, 2025).

Gudinas's argument that his age of twenty years at the time of the murder should bar his execution based on "developmental literature and neuroscience research which states that there was a lack of maturity, an undeveloped sense of responsibility, increased vulnerability and susceptibility to outside negative influences in a person that was not fully formed at this age" is also procedurally barred, because it too could have been raised in a prior proceeding. Gudinas does not identify any specific "literature" or "research" that he believes would apply here, but literature, research, studies, reports, and cases discussing maturity, age, and the fact that the brain is not fully developed or matured by the age of eighteen or twenty or even twenty-five have been well known in the public domain for decades, and even before *Roper* was decided. *See, e.g., Barwick v. State*, 361 So. 3d 785, 793 (Fla. 2023) (noting that a

- 15 -

2022 "resolution" from the American Psychological Association taking the position that the death penalty should be banned when the offender was under twenty-one years old at the time of the capital offense was "based on a compilation of studies, research, data, and reports, published between 1992 and 2022 and relying on data from as early as 1977"); *Morton v. State*, 995 So. 2d 233, 245-46 (Fla. 2008) (mentioning a 2004 brain mapping study, which establishes that sections of the human brain are not fully developed until age twenty-five; a 2007 article stating that in the past few decades, neuroscientists have discovered that two key developmental processes, myelination and pruning of neural connections, continue to take place during adolescence and well into adulthood; and a 1967 article stating that brain regions responsible for basic life processes and sensory perception tend to mature fastest, whereas the regions responsible for behavioral inhibition and control, risk assessment, decision making, and emotion maturing take longer).  Thus, any claim that *Roper* should be extended to him based on his age at the time of the murder could have been raised in one of Gudinas's many prior proceedings. The same is true for any claim that *Atkins* should be extended to

him based on his "lifelong mental illnesses" or his "impairments," which he concedes "were in place at the time of the crime[s]." Thus, Gudinas's claim is procedurally barred because it could have been raised previously. *E.g.*, *Barwick*, 361 So. 3d at 795 (concluding that extension-of-*Atkins* claim was procedurally barred in an active warrant case because it could have been raised previously); *Branch v. State*, 236 So. 3d 981, 986 (Fla. 2018) (holding that an extension-of-*Roper* claim was procedurally barred in an active warrant case because it could have been raised previously); *Simmons v. State*, 105 So. 3d 475, 511 (Fla. 2012) (rejecting as procedurally barred a claim, based on *Roper* and *Atkins*, that the defendant was exempt from execution based on mental illness and neuropsychological deficits because it could have been raised in prior proceedings). The circuit court therefore properly concluded that Gudinas's claim of newly discovered "brain impairment" that he argues should subject him to protections similar to those afforded by *Atkins* and *Roper* is untimely and procedurally barred.

Finally, this claim lacks merit. Even if Gudinas's claim of newly discovered evidence were facially sufficient and Dr. Eisenstein's finding of "brain impairment" could be deemed newly

discovered, it cannot be said that such general and conclusory evidence would be of such a nature that it would probably produce a life sentence at retrial. This is especially true given the extensive testing and evaluation that Dr. Upson performed on Gudinas, and the credibility findings made with regard to Dr. Upson by both the trial and postconviction courts.

Further, we have repeatedly held that "the categorical bar of *Atkins* that shields the intellectually disabled from execution does not apply to individuals with other forms of mental illness or brain damage." *Barwick*, 361 So. 3d at 795 (quoting *Dillbeck v. State*, 357 So. 3d 94, 100 (Fla. 2023)); *see also Hutchinson v. State*, No. SC2025-0517, 2025 WL 1198037, at *6 (Fla. Apr. 25) (rejecting claim that *Atkins* should be extended to individuals with certain neurocognitive disorders), *cert. denied*, No. 24-7087, 2025 WL 1261217 (U.S. May 1, 2025); *Dillbeck*, 357 So. 3d at 100 (rejecting claim *Atkins* should be extended to individual with mental illness and neurological impairments); *Carroll v. State*, 114 So. 3d 883, 887 (Fla. 2013) (rejecting claim that the protections of *Atkins* and *Roper* should be extended to defendant who is less culpable as a result of mental illness as untimely, procedurally barred, and meritless);

*Simmons*, 105 So. 3d at 511 (rejecting as meritless claim that persons with mental illness must be treated similarly to those with intellectual disability due to reduced culpability); *Lawrence v. State*, 969 So. 2d 294, 300 n.9 (Fla. 2007) (rejecting assertion that the Equal Protection Clause requires extension of *Atkins* to the mentally ill due to their reduced culpability).

We have also repeatedly rejected the argument that *Roper*'s categorial ban on the execution of individuals who were under eighteen years old at the time they committed their capital offense(s) should be extended to defendants whose chronological age was over eighteen at the time of their offense(s). *See Ford v. State*, 402 So. 3d 973, 979 (Fla.) (rejecting claim that the protections of *Roper* should be extended to Ford, who was thirty-six at the time of his capital crimes, because he has a mental and developmental age below eighteen years), *cert. denied*, 145 S. Ct. 1161 (2025); *Barwick v. State*, 88 So. 3d 85, 106 (Fla. 2011) (rejecting claim that *Roper* should extend to Barwick, who was nineteen when he committed the capital crime, because his mental age was less than eighteen); *Stephens v. State*, 975 So. 2d 405, 427 (Fla. 2007) (rejecting claim that *Roper* and the Eighth Amendment barred execution of

defendant who had a mental and emotional age of less than eighteen years because his chronological age at the time of his crimes was twenty-three); *Hill v. State*, 921 So. 2d 579, 584 (Fla. 2006) (rejecting an extension-of-*Roper* claim and holding "*Roper* only prohibits the execution of those defendants whose *chronological* age is below eighteen"). Unlike many of the defendants in the cases cited by Gudinas, Gudinas does not allege that his mental or developmental age was under eighteen at the time of the murder; he simply argues that *Roper*'s protections should be extended to him based on his chronological age of twenty at the time of the murder in this case. But because Gudinas was indeed twenty years old "at the time of the murder[], it is impossible for him to demonstrate that he falls within the ages of exemption, rendering his claim facially insufficient and therefore properly summarily denied." *Ford*, 402 So. 3d at 979 (citing *Morton*, 995 So. 2d at 245) ("Because it is impossible for Morton to demonstrate that he falls within the ages of exemption, his claim is facially insufficient and it was proper for the court to deny Morton a hearing on this claim.")).

This claim also lacks merit because, as we have explained, this Court lacks the authority to extend *Atkins* or *Roper*.

> The conformity clause of article I, section 17 of the Florida Constitution provides that "[t]he prohibition against cruel or unusual punishment, and the prohibition against cruel and unusual punishment, shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution." This means that the Supreme Court's interpretation of the Eighth Amendment is both the floor and the ceiling for protection from cruel and unusual punishment in Florida, and this Court cannot interpret Florida's prohibition against cruel and unusual punishment to provide protection that the Supreme Court has decided is not afforded by the Eighth Amendment.

*Id.* at 979 (alteration in original) (quoting *Barwick*, 361 So. 3d at 794).

Because the Supreme Court has interpreted the Eighth Amendment to limit the exemption from execution based on mental functioning to those who are intellectually disabled or insane and the exemption from execution based on age to those whose chronological age was less than eighteen years at the time of their capital crime(s), this Court is bound by those interpretations and is precluded from interpreting Florida's prohibition against cruel and unusual punishment to exempt individuals from execution whose

- 21 -

mental or cognitive issues do not rise to the level of intellectual disability or those whose chronological age was over eighteen years at the time of their capital crime(s). This claim was therefore properly denied as meritless.

## B. Florida's Eighth Amendment Conformity Clause

Gudinas next contends that the circuit court erred in denying his claim that Florida's Eighth Amendment conformity clause in article I, section 17 of the Florida Constitution is unconstitutional. Gudinas claims that by applying the conformity clause and foreclosing the possibility of courts interpreting the Florida prohibition against cruel and unusual punishment to provide more protections than the Eighth Amendment as interpreted by the United States Supreme Court, Florida is foreclosing Gudinas's access to the courts, violating his Fourteenth Amendment due process rights, and violating his Eighth Amendment right to a true merits-based evaluation of his claims, premised on the evolving standards of decency that mark the progress of a maturing society. The circuit court properly determined this claim to be procedurally barred and meritless.

Post-warrant claims that could have been raised in a prior proceeding are procedurally barred.  *Rogers*, 2025 WL 1341642, at *4.  Gudinas's reason for not raising this claim earlier is that it is a "purely legal claim[] in support of Claim One," which was his newly discovered evidence/extension-of-*Atkins*/extension-of-*Roper* claim. As we have already explained, Gudinas's "Claim One" could have and should have been raised in a prior proceeding, and this "supporting" claim likewise could have been raised in a prior proceeding.

Gudinas has also failed to show how the conformity clause in article I, section 17 violates his federal constitutional rights.  While the states are required to adhere to the Supreme Court's Eighth Amendment jurisprudence, neither the Eighth nor Fourteenth Amendments require states to expand the protections afforded by the Eighth Amendment or to interpret their own corresponding state constitutional prohibitions against cruel and unusual punishment in a more expansive manner than the Supreme Court has interpreted the federal prohibition.

Gudinas's assertion that Florida's adherence to the conformity clause in article I, section 17 has denied him access to the courts is

baseless. Even the fact that this claim is now procedurally barred does not violate his access to the courts or his right to be heard at the appropriate time and in accordance with the laws and procedural rules of this state.

## C. Applicability of Rule 3.851(d)(2)

Gudinas next posits that the circuit court erred in denying his claim that application of rule 3.851(d)(2)—which sets forth the three exceptions to the one-year time limit for filing motions for postconviction relief[7]—is unconstitutional when applied to successive motions filed after the signing of a death warrant. We recently addressed and rejected this argument in *Ford*, 402 So. 3d

---

7. Rule 3.851 limits the filing of a motion for postconviction relief to within one year of the date the defendant's conviction and sentence become final, unless it alleges one of the following exceptions set forth in subdivision (d)(2):

(A) the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence, or

(B) the fundamental constitutional right asserted was not established within the period provided for in subdivision (d)(1) and has been held to apply retroactively, or

(C) postconviction counsel, through neglect, failed to file the motion.

at 977-78, which was another post-death warrant proceeding. Gudinas concedes that our decision in *Ford* is directly adverse to the arguments he presents here, but nonetheless "raises these arguments with the good faith belief that the application of Rule 3.851(d)(2) to active warrant cases continues to raise serious constitutional concerns."

Gudinas, who is represented by the same attorneys who argued *Ford*, presents essentially the same arguments made in *Ford*. In rejecting these arguments in *Ford*, we explained that finding rule 3.851(d)(2) inapplicable to defendants under an active death warrant would allow defendants, upon the scheduling of an execution date, to be permitted to litigate anew any claim that was (and likely those that should have been) raised previously and entitled to a ruling on the merits of those claims. We found this position lacking any legal support and contrary to the intent of the Legislature. We explained that

> [i]n crafting the terms and conditions that govern criminal appeals and collateral review, the Legislature provided "that all terms and conditions of direct appeal and collateral review be strictly enforced, including the application of procedural bars, to ensure that all claims of error are raised and resolved at the first opportunity." § 924.051(8), Fla. Stat. The litigation of a successive

> motion for postconviction relief filed by a defendant under an active death warrant is collateral review. If the Legislature intended to suspend procedural bars for claims raised by defendants under active death warrants, it could have done so. *See Cason v. Fla. Dep't of Mgmt. Servs.*, 944 So. 2d 306, 315 (Fla. 2006) ("[T]he Legislature 'knows how to' accomplish what it has omitted in the statute in question.").

*Id.* (second alteration in original). Gudinas has provided neither a basis on which we could rely to violate the intent of the Legislature regarding procedural bars as applied to collateral review nor a compelling reason to depart from our recent precedent on the matter.

We also rejected Ford's claims that application of rule 3.852(d) resulted in a denial of due process and his right to access to courts. *Id.* at 978. Like Ford, Gudinas has not been denied an opportunity to bring his claims before the courts and to be heard at the appropriate time(s) and through the appropriate channel(s).

### D. Demand for Public Records

After the death warrant was signed on May 23, 2025, Gudinas filed a demand for the production of public records from the

Executive Office of the Governor[8] under Florida Rule of Criminal

---

8. The circuit court summarized the records demanded as follows:

a) All communications between the Governor or any current or former employee of his office with the Florida Parole Commission and/or the Office or Executive Clemency related "in any way whatsoever" to Defendant;

b) All communications between the Governor or any current or former employee of his office with any other current or former employee of the Office of the Attorney General related "in any way whatsoever" to Defendant;

c) Any document outlining the criteria for obtaining executive clemency and/or the process for selecting suitable candidates;

d) Any document outlining the criteria for determining how to grant executive clemency and the factors considered;

e) The number of death row inmates selected for clemency review and the number for whom review has been completed;

f) All documents outlining the selection criteria and processes for inmates subject to the entry of a death warrant, including the factors considered in issuing a warrant;

g) Names of everyone on Florida's Death Row who have had complete or partial clemency investigations or whose case resulted in clemency[;]

h) Names and dates of those whom clemency was denied; and

Procedure 3.852(h)[9] and (i)[10]. The circuit court found that the

records Gudinas requested generally related to the Governor's

processes for granting clemency, which it concluded renders them

i) All correspondence/written communications between the Governor's office and the Florida Supreme Court identifying individuals eligible for a death warrant from January 1, 2023 to present.

9. Rule 3.852(h)(3) provides that within ten days after the signing of a death warrant, a records request may be made to "a person or agency from which collateral counsel has previously requested public records." The rule provides that upon such request, "[a] person or agency shall copy, index, and deliver to the [records] repository any public record: (A) that was not previously the subject of an objection; (B) that was received or produced since the previous request; or (C) that was, for any reason, not produced previously."

10. Rule 3.852(i)(1) provides that collateral counsel may obtain public records "in addition to those provided under subdivisions (e), (f), (g), and (h) of this rule" if counsel files an affidavit in the trial court which:

(A) attests that collateral counsel has made a timely and diligent search of the records repository; and

(B) identifies with specificity those public records not at the records repository; and

(C) establishes that the additional public records are either relevant to the subject matter of the postconviction proceeding or are reasonably calculated to lead to the discovery of admissible evidence; and

(D) shall be served in accord with subdivision (c)(l) of this rule.

- 28 -

"clearly confidential and exempt from public records requests under section 14.28, Florida Statutes (2024)[,] and the Florida Rules of Executive Clemency." The court also found the demands overly broad, unduly burdensome, and not reasonably calculated to lead to a colorable claim for relief. The court further concluded that Gudinas's failure to previously request documents from the Executive Office of the Governor foreclosed any current effort to obtain those records under rule 3.852(h)(3). We review the denial of Gudinas's demand for public records for abuse of discretion, *Muhammad v. State*, 132 So. 3d 176, 200 (Fla. 2013), and find none.

The requested records relating to the clemency process are exempt from disclosure. *Id.* at 203. Section 14.28, Florida Statutes (2024), provides that "[a]ll records developed or received by any state entity pursuant to a Board of Executive Clemency investigation shall be confidential and exempt from the provisions of s. 119.07(1) and s. 24(a), Art. I of the State Constitution." In other words, they are exempt from disclosure as public records. Additionally, rule 16 of the Florida Rules of Executive Clemency provides:

Due to the nature of the information presented to the Clemency Board, all records and documents generated and gathered in the clemency process as set forth in the Rules of Executive Clemency are confidential and shall not be made available for inspection to any person except members of the Clemency Board and their staff.

This Court has held that "to the extent section 14.28 could be read to exclude certain clemency materials from confidentiality [i.e., non-investigatory documents], Rule of Executive Clemency 16, which provides that *all* records in the clemency process are confidential, controls . . . ." *Chavez v. State*, 132 So. 3d 826, 831 (Fla. 2014). And under section 14.28 and rule 16, only the Governor can authorize the release or inspection of such records. *See* § 14.28, Fla. Stat. (2024) ("[S]uch records may be released upon the approval of the Governor."); Rule 16, Rules of Executive Clemency ("Only the Governor . . . has the discretion to allow such records and documents to be inspected or copied."). Thus, the circuit court was without the authority to grant Gudinas's demands related to the clemency process. *See Parole Comm'n v. Lockett*, 620 So. 2d 153, 157-58 (Fla. 1993) (holding that a trial judge's order to disclose clemency records "would effectively overrule the rules of

- 30 -

executive clemency, resulting in a violation of the separation of powers doctrine").

The circuit court also concluded that the demands were not reasonably calculated to lead to a colorable claim for relief. The procedures of rule 3.852(h) and (i) are "not intended to be a procedure authorizing a fishing expedition for records unrelated to a colorable claim for postconviction relief." *Cole v. State*, 392 So. 3d 1054, 1065-66 (Fla.) (quoting *Asay v. State*, 224 So. 3d 695, 700 (Fla. 2017)), *cert. denied*, 145 S. Ct. 109 (2024); *see also Dailey v. State*, 283 So. 3d 782, 792 (Fla. 2019) (stating that under rule 3.852(i), requests must show how the records relate to a colorable claim for postconviction relief); *Rutherford v. State*, 926 So. 2d 1100, 1117 (Fla. 2006) (affirming denial of records request under rule 3.852(h)(3) because the records were not related to a colorable claim for postconviction relief).

Gudinas expressly stated in his demand that the records were sought in hopes of discovering evidence that "Florida's clemency process, and the manner in which the Governor determined that Gudinas should receive a death warrant on May 23, 2025," are unconstitutional. But this Court has repeatedly denied similar

claims and consistently held that Florida's established clemency proceedings and the Governor's absolute discretion to issue death warrants do not violate the Florida or United States Constitutions. *E.g.*, *Bolin v. State*, 184 So. 3d 492, 503 (Fla. 2015) (rejecting claim that Governor's discretion to select an inmate for execution is unconstitutional); *Muhammad*, 132 So. 3d at 203-04 (concluding that "records would not relate to a colorable claim because we have held many times that claims challenging clemency proceedings are meritless"); *Wheeler v. State*, 124 So. 3d 865, 890 (Fla. 2013) (rejecting claim that because there are no meaningful standards that constrain the Governor's absolute discretion in determining which death warrant to sign, Florida's capital sentencing scheme violates the Eighth Amendment); *Carroll*, 114 So. 3d at 887 (rejecting argument that the Governor's power to select which death row prisoner for whom he will sign a death warrant is arbitrary, without standards, and without any process for review, thus rendering the death penalty unconstitutional); *Mann v. State*, 112 So. 3d 1158, 1163 (Fla. 2013) (holding that records sought in the hopes of supporting allegation that the Governor's selection of Mann for a death warrant was somehow tainted by public input

were not relevant to any colorable claim, and that such a claim is not cognizable); *Gore v. State*, 91 So. 3d 769, 780 (Fla. 2012) (rejecting constitutional challenge to clemency process and warrant selection because of Governor's absolute discretion to sign death warrants); *Valle v. State*, 70 So. 3d 530, 551-52 (Fla. 2011) (rejecting a claim that the Governor's absolute discretion to sign death warrants renders Florida's death penalty structure unconstitutional). Thus, Gudinas's demands seeking records to challenge the constitutionality of Florida's clemency process and the Governor's absolute discretion to sign a death warrant cannot relate to a colorable claim for postconviction relief.

We also find no abuse of discretion in the circuit court's determination that Gudinas's demands were overly broad and unduly burdensome, and that Gudinas's failure to previously request documents from the Executive Office of the Governor foreclosed any current effort to obtain those records under rule 3.852(h)(3).

### III.  CONCLUSION

For the reasons stated above, we affirm the circuit court's orders summarily denying Gudinas's third successive motion for

postconviction relief and denying his demand for public records.

We also deny his motion for a stay of execution.

No motion for rehearing will be entertained by this Court. The mandate shall issue immediately.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result.

An Appeal from the Circuit Court in and for Orange County,
    John E. Jordan, III, Judge
    Case No. 481994CF007132000AOX

Eric Pinkard, Capital Collateral Regional Counsel, Ali Shakoor, Assistant Capital Collateral Regional Counsel, and Adrienne Joy Shepherd, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, Leslie T. Campbell, Senior Assistant Attorney General, West Palm Beach, Florida, and Lisa-Marie Lerner, Senior Assistant Attorney General, West Palm Beach, Florida,

    for Appellee